The UNITED STATES of America, Plaintiff,

v.

Arthur Lawrence STICKELL, also known as Arthur Stickel and Lawrence Stickell, Defendant.

Crim. A. No. 17263.

United States District Court
D. Colorado.

Oct. 14, 1964.

**DOYLE, District Judge.**

On August 21, 1964, following a trial to a jury the defendant was convicted on three counts of transporting in interstate commerce from Waukegan, Illinois, to the District of Colorado certain securities, namely, cashiers' checks in the amounts of $48,000, $45,000 and $10,000 respectively, which checks were drawn by the Byers State Bank, Byers, Colorado.

On September 21, 1964, within the time granted by the Court, defendant filed his Motion for Judgment of Acquittal Notwithstanding Verdict, or, in the Alternative, Motion for a New Trial. This is the matter which is now before the Court.

It is necessary to relate at least some of the facts which were developed at the trial:

The defendant is an Illinois lawyer who was fiduciary of an estate in Knox County, Illinois; that of Clara Beacham Swanson. On July 2, 1963, the Probate Court of Knox County ordered defendant to make an accounting of the funds of the estate to the Court on July 16, 1963. He failed, however, to comply with this order and a writ of contempt was issued. The defendant was, on July 15, 1963, in Denver negotiating the purchase of the Byers State Bank which had been owned for approximately thirty years by Mr. and Mrs. W. L. Best and their son, Hugh Best. This bank then had demand deposits totaling approximately one-half million dollars. On July 22, 1963, defendant entered into a contract for the purchase of the bank for a sum in excess of $200,000. He gave two promissory notes totaling $180,000 to secure payment. A Mr. Johnson, agent of the defendant, also signed the contract as a purchaser. According to his testimony he did so as an accommodation for the defendant. In addition to the two notes Johnson, on behalf of defendant, gave a personal check to the Bests in the amount of $30,000. At the same time defendant gave Johnson a bank draft drawn in this amount on the Lords Bank & Trust in Nassau, Bahamas. This was to cover Johnson's check.

Lawrence M. Henry, U. S. Atty., for Dist. of Colorado, James A. Clark, Asst. U. S. Atty. for Dist. of Colorado, Denver, Colo., for plaintiff.

Zarlengo, Zarlengo, Seavy & Mulligan, Denver, Colo., and George J. Cotsirilos, Chicago, Ill., for defendant.

On July 23, a meeting of the Board of Directors of the Byers Bank was held and the Bests resigned and Johnson and Mr. Webb, attorney for defendant at that time, were elected as President and Director, respectively. After this, defendant caused the cashiers' checks in question to be issued. There were four of them. The first of these was in the amount of $30,000 and this was delivered to Johnson to cover his personal check. The head bookkeeper testified that he was then somewhat suspicious because the number of the $30,000-cashier's check indicated that there were four others which were unaccounted for. On Friday, July 26, 1963, the defendant instructed Johnson to sign in blank the four next checks and deliver them to the defendant and he represented to Johnson that he intended to establish correspondent relationships with banks in the Chicago area for the Byers bank. At the same time defendant delivered four signed checks on his personal account on the Galesburg Bank at Galesburg, Illionis, instructing Johnson that he would inform him of the amount filled in on the cashiers' checks and Johnson should conform the defendant's personal checks and deposit them at Byers to cover the cashiers' checks.

Apparently, all these machinations were designed to cover shortages in the Clara Beacham Swanson Estate because on Saturday, July 27, 1963, defendant appeared at the Little Fort Bank in Waukegan, Illinois, and opened up a new account under the name of Clara Beacham Swanson Estate. Two of the cashiers' checks in the face amount of $45,000 and $48,000 were deposited in that account. The bank credited the account and sent the items with its cash letter on Monday, July 29, 1963, to its correspondent who forwarded them to the Denver Federal Reserve Bank with its cash letter dated July 30, 1963. The latter bank sent them on to Byers for payment. On August 1, 1963, Byers returned the items unpaid and wired protest to the Galesburg Bank.

On Saturday, July 27, 1963, the third one of the cashiers' checks in the amount of $10,000 was filled in by the defendant and was deposited at the bank at Galesburg, Illinois, in the personal account of defendant. The President of the Galesburg Bank telephoned the Byers Bank and thereafter sent this item directly to the First National Bank of Denver for collection. It arrived on July 31, 1963, was forwarded to Byers and was also returned unpaid.

Subsequently, on July 29, 1963, defendant filed an accounting in the Knox County Court showing $93,000 in hand as funds of the estate and showing that these funds had been derived from the sale of certain United States Treasury obligations.

While the defendant was conducting his Illinois negotiations the head cashier at the Byers Bank, who as before noted had become suspicious, notified the State bank examiners. This was on Saturday, July 27, 1963. The following Monday, eight examiners appeared at the bank and more or less took charge of it. Subsequently, as above noted, the items here in question were dishonored.

Each of the counts of the Indictment is predicated upon clause 1 of Title 18 U.S.C. § 2314. This provides:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;"

It is to be noted that this provision contains the words "of the value of $5,000 or more."

In accordance with this provision the Indictment alleges that each of the purported cashier's checks had a value of $5,000 or more.

Defendant now contends that inasmuch as these checks were issued under conditions which render them unenforceable as between the parties, at least, they did not have a value of $5,000 or any value, and thus the evidence is insufficient to support the allegations of the indictment and a judgment of acquittal should be granted. Thus, the question to be

considered is whether cashiers' checks issued pursuant to a scheme to divert assets of the bank in fraud of the depositors are valueless within the meaning of the statute in question.

Some aid is provided by the statute itself which contains a definition of "value." This is as follows:

" 'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."

The jury was instructed as to the statutory definition of "value" as follows:

"I think that this term 'face value' implies that it does have an intrinsic value, however. In other words, not that it shall have been merely a false non-value instrument. I think that one test that is fairly reliable is what an item will bring on the market, as to whether it has value."

A cashier's check is a bill of exchange drawn by a bank upon itself and is accepted by the act of issuance. 7 Am.Jur. 909, § 211. Thus, a cashier's check has no magic quality; it is merely a check drawn by a bank on its own funds and thus the credit of the bank is sold to the purchaser to the extent of the face amount of the check. Because of this its negotiability is enhanced, but its legal character is not much different from that of an ordinary check. A check is, of course, a bill of exchange which does not operate as an assignment of the funds in the hands of the drawee. Ordinarily, the drawee is not liable on the check unless and until he accepts the same. Where, however, the drawer and the drawee are the same, as in the case of the cashier's check, the bank issuing it is primarily obligated on it. It is, of course, readily enforceable in the hands of a holder in due course.

It must be conceded, however, that in the case at bar neither of the banks was a holder in due course. They forwarded these checks for collection and gave no consideration for them. Consequently, the checks were not sold on the open market and were not enforced. Since their value has not been demonstrated by an actual sale, we must determine whether the potential which they possessed to impose a liability gave to them the value which is here requisite. It would be possible to give full effect to the terms of the statute and say that any face value, even that which appears on a fictitious instrument or void instrument would be sufficient to satisfy clause 1 of the statute. However, such void instruments are considered in other parts of the statute and it would thus appear that clause 1 contemplates that the instrument shall have at least some temporary validity.

The defendant in the case at bar was unquestionably acting beyond the authority of even an owner when he procured the issuance of these cashiers' checks without having the funds to replace the moneys represented by the checks. Did this fact render the instruments absolutely void as the defendant contends? This must be answered in the negative. The defendant had the legal power to obtain the issuance of the instruments even though he did not have the legal right to do so. Unquestionably, a holder in due course could have enforced these instruments against the bank at Byers. The defense which the bank could have had was a personal defense, good only against the defendant Stickell, or the estate. It follows, therefore, that the instruments were not void; they were merely voidable, and until such time as they were formally dishonored they had the requisite potential to impose an obligation. In these circumstances it has to be concluded that they satisfied the value requirement of the statute.

A discussion contained in the case of United States v. Bollenbach, 147 F.2d 199 (2nd Cir.), opinion by Judge Learned Hand, supports the conclusion here reached. There the securities were notes

of a corporation in reorganization. These notes had been fastened to proofs of claim which had been allowed by the court and were on file with the court's clerk. The notes were detached from the proofs of claim without authority and were taken to New York where they were sold for more than $5,000. Defendant there argued that since the claim in bankruptcy had been allowed the notes were merged in the claims which had been reduced to judgment and were no longer negotiable. However, the Court of Appeals rejected this argument and said:

" * * * Besides stolen 'securities,' presumably valid, the statute covers 'falsely made, forged, altered or counterfeited securities,' and it can scarcely have been the purpose of Congress to exclude a security, originally valid, but later merged in a claim, and yet to include securities void from their inception. A lower limit was set for valid securities to exclude petty thefts; there was none in the case of false securities; and if, as the accused argues, the notes here in question had really been merged, they more nearly approached altered securities than valid ones. They had an actual value of $5,000, as the record shows, even though it was factitious, and would not have survived a full disclosure of the facts."

Thus, the Court recognized that the value of the instruments involved in the Bollenbach case was factitious, and "would not have survived a full disclosure of the facts." The same can be said of the instruments which are before us. Nevertheless, the checks in the case at bar, like the notes in the Bollenbach case, had an actual value within the meaning of the statute exceeding $5,000.00.

Accordingly, the motions of the defendant must be, and they are hereby denied. The defendant will appear on notice given by the District Attorney for sentencing.