## UNITED STATES v. BOLLENBACH.
### No. 40.

Circuit Court of Appeals, Second Circuit.

Dec. 5, 1944.

As Modified on Rehearing Jan. 12, 1945.

Writ of Certiorari Granted April 2, 1945.

See 65 S.Ct. 915.

200

Leo C. Fennelly, of New York City, for appellant.

Harold J. McAuley and John F. X. McGohey, U. S. Atty., both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Bollenbach was indicted upon two counts: for transporting "securities of the value of $5,000" in interstate commerce, knowing them to have been stolen, and for a conspiracy to commit that offence. The jury acquitted him upon the first count, and convicted him upon the second. The errors of which he complains are as follows: (1) That the stolen property was not shown to have been worth $5,000; (2) that the judge's instructions were erroneous; (3) that evidence was admitted against him of other crimes of the same kind; (4) that the evidence did not sup-

port the verdict—especially because the transportation had ended before Bollenbach became connected with it; and (5) that incompetent testimony was admitted against him.

■ The stolen securities were negotiable notes of a corporation in reorganization in the United States District Court for the District of Minnesota; they had been fastened to "proofs of claim" which had been "allowed" by the court, and were on file with its clerk. Some one detached the notes from the "proofs of claim," stole them from the clerk's office, brought them to New York, and sold them for more than $5,000. The argument is that, since a claim in bankruptcy, or in reorganization, becomes a judgment, when it has been "allowed", United States v. American Surety Co., 2 Cir., 56 F.2d 734, 736; Lewith v. Irving Trust Co., 2 Cir., 67 F.2d 855, the notes were merged in the claims, and were valueless when detached. Besides stolen "securities," presumably valid, the statute covers "falsely made, forged, altered or counterfeited securities," and it can scarcely have been the purpose of Congress to exclude a security, originally valid, but later merged in a claim, and yet to include securities void from their inception. A lower limit was set for valid securities to exclude petty thefts; there was none in the case of false securities; and if, as the accused argues, the notes here in question had really been merged, they more nearly approached altered securities than valid ones. They had an actual value of $5,000, as the record shows, even though it was factitious, and would not have survived a full disclosure of the facts.

■■ The second alleged error we shall come back to later; the third consists of the admission of evidence that the accused had been concerned in earlier crimes of the same sort. We are not clear whether the objection is that the evidence was not competent at all, or whether it should not have been admitted after it appeared that the accused had confessed in writing the commission of the earlier crimes. That the commission of earlier crimes of the same kind is always competent on the issue of intent is too well settled to justify the citation of authorities; and it is difficult to see what prejudice the accused could have suffered by calling witnesses to confirm his own written confession. Even if he did, there was no reason not to make

assurance doubly sure by supplementing his confession by testimony, for juries often regard confessions with suspicion.

■ The fourth error is of the insufficiency of the evidence and depends principally upon the supposed incredibility of the testimony of one Chell Smith, who identified the accused as having been in the clerk's office in Minnesota before the theft. Had we been on the jury, we should indeed have laid little weight upon the identification, but clearly its credibility was for the jury and we may not intervene. The fact that the overt acts were all laid at a time after the transportation of the notes had ended in New York presupposes that the accused could not be convicted of a conspiracy which he only joined thereafter. It is more conveniently dealt with in connection with the second point to which we now come; i. e., the judge's charge.

The colloquial charge was unexceptionable; and indeed the accused did not except to it. However, after the jury had been out seven hours and were, in the foreman's words, "hopelessly deadlocked," they came into court to report their disagreement, and during the interchange that followed one of them asked whether "any act of conspiracy" could be "performed after the crime had been committed." The judge failed to answer this question directly, and again the accused did not except. The jury went out a second time, but soon came back; and the accused's attorney then excepted to the judge's earlier failure to answer the question, to which the judge mistakenly replied that he had already told them that there could be no conspiracy after the object of the conspiracy had been attained. He then proceeded to read a note from the jury, asking whether the accused could be guilty of conspiracy if he knew the bonds were stolen when he helped to dispose of them. To this the judge answered: "Of course if it occurred afterwards it would not make him guilty, but in that connection I say to you that if the possession was shortly after the bonds were stolen, after the theft, it is sufficient to justify the conclusion by you jurors of knowledge by the possessor that the property was stolen. * * * I further charge you that possession of stolen property in another state than that in which it was stolen shortly after the theft, raises a presumption that the possessor was a thief, and transported stolen property in inter-

state commerce, but that such presumption is subject to explanation and must be considered with all the testimony in the case." To this the accused excepted; the jury went out and came in ten minutes later with a verdict on the count for conspiracy.

■ The meaning of the first sentence, just quoted, is clear: i. e., although the accused would not be guilty of conspiracy if he only learned that the notes were stolen after he had disposed of them, he would be guilty, if he learned so before. That implied that he could be guilty of a conspiracy to transport stolen notes, if he joined in their disposal after the transportation had ended. Strictly speaking, that was not any part of the crime for which he had been indicted; the substantive crime—and also the conspiracy to commit it—ended when the notes came to rest in New York. However, to help dispose of them was to become an accessory after the fact, and that was also a crime (§ 551, Title 18 U.S.C.A.). It was therefore also a crime to join a conspiracy to dispose of them; and for that crime the conspirators joining after the transportation was over might be indicted as principals. Skelly v. United States, 10 Cir., 76 F.2d 483. (Incidentally, this disposes of the objection that the overt acts were all laid after the notes had come to New York.)

■ So far the judge's charge was therefore right; but we think it was wrong to tell the jury that the possession of the notes raised a presumption that the accused was the thief and had transported them in interstate commerce, although it is only fair to add that the mistake was ours, not his, for, as will appear, he borrowed the instruction directly from us. We shall assume, arguendo, as we did in United States v. Crimmins, 2 Cir., 123 F.2d 271, that it may not be necessary in a prosecution for the substantive crime to prove that an accused, who knows that the securities have been stolen, also knows that they are being moved in interstate commerce. Indeed, we have so decided in the case of receivers of stolen property. Rosen v. United States, 2 Cir., 271 F. 651. But there can be no doubt that such knowledge is necessary to a conviction for conspiring to transport, since no agreement can go beyond the terms of the confederates' mutual understanding. That possession of stolen goods shortly after the theft raises a presumption of knowledge that they have been stolen is indeed well-

settled law; but in Drew v. United States, 2 Cir., 27 F.2d 715, 716, from which the judge quoted in his charge, we went much further, for, in an appeal from a conviction for the substantive offence, we declared that recent possession "raised a presumption that he" (the accused) "was the thief and had transported it" (the stolen car) "to New York." The decision has been often cited, but never for more than the presumption of guilty knowledge.

It was quite unnecessary in Drew v. United States, supra, to say anything more; other evidence in the record proved that the stolen car had been transported from New Jersey; patently it had been brought from that state. That was enough, for the accused, once knowledge was brought home to him that the goods were stolen, was guilty either as the thief, or, as we have shown, as accessory after the fact under § 551 of Title 18 U.S.C.A. Certainly it is untenable to say that the possession of stolen goods raises any presumption that they have in fact been transported in interstate commerce. Possibly, when they have in fact been transported, it is a little less unreasonable to say that possession raises a presumption that their possessor knew that they have been transported; but we did not say that, and if we had, it would have been totally without support in the books, and, as res integra, it could not be defended, at least in the case of negotiable securities like those at bar. It is of course possible that a man, dealing in stolen securities, and knowing or suspecting that they have in fact been stolen, may inquire where the seller got them; but it is more likely that he will not wish to do so. Inquiry is apt to add to that information any evidence of which he will at all hazards wish to suppress; it will be safer to take the securities as they are presented than to meddle into their source. The dictum in Drew v. United States, supra, 2 Cir., 27 F.2d 715, was an inadvertence, and it is overruled.

We were at first under the mistaken impression that we could not properly disregard this error because the only evidence as to whether the accused knew that the bonds had come from another state was the testimony of Chell Smith. The prosecution calls our attention to the fact that this is not true, because upon an examination before two agents of the Federal Bureau of Investigation after his arrest, the accused stated that he knew that the bonds had come "from the West." This statement, taken on September 8th, 1939, he signed on the 21st, on the advice of his counsel who was present at the time, and his brief on this appeal conceded that he knew that Burns had obtained the bonds in the West. In the face of that statement and that concession it would be altogether unwarranted to reverse the judgment because of the mistake in the charge which we have discussed.

Judgment affirmed.