## BOLLENBACH v. UNITED STATES.

No. 41. Argued October 12, 15, 1945.—Decided January 28, 1946.

*Mr. Bernard Hershkopf,* with whom *Mr. Henry G. Singer* was on the brief, for petitioner.

*Mr. W. Marvin Smith,* with whom *Acting Solicitor General Judson* and *Mr. Leon Ulman* were on the brief, for the United States.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The petitioner was convicted of conspiring to violate the National Stolen Property Act. The Circuit Court of Appeals for the Second Circuit sustained the conviction. 147 F. 2d 199. We brought the case here, 324 U. S. 837, because it was submitted to the jury in a way that raised an important question in the administration of federal criminal justice.

The relevant facts upon which decision must turn are these. Bollenbach, the petitioner, and others were indicted upon two counts: for transporting securities in interstate commerce knowing them to have been stolen (48 Stat. 794, 18 U. S. C. § 415; 35 Stat. 1152, 18 U. S. C. § 550) and for conspiring to commit that offense (35 Stat. 1096, 18 U. S. C. § 88). Having been granted a severance, Bollenbach was tried separately. No doubt the securities had been stolen in Minneapolis and were transported to New York. And it is not controverted that Bollenbach helped to dispose of them in New York.

The question is whether he was properly convicted under the indictment. The trial lasted seven days. After the jury had been out seven hours they returned to the court to report that they were "hopelessly deadlocked." Interchanges then ensued between court and jury and between court and counsel. One of the jurors asked "Can any act of conspiracy be performed after the crime is committed?" The trial judge made some unresponsive comments but failed to answer the question. No exception was noted immediately. In a few minutes the jury left, but after twenty minutes again returned for further instructions. Bollenbach's counsel then indicated that the court had left the bench too hurriedly to enable him to except to the judge's failure to answer the question. After an exception was then taken and allowed, the judge "mistakenly replied," as the lower court noted, "that he had already told them that there could be no conspiracy after the object of the conspiracy had been attained."

After indulging in further colloquy with counsel, not here pertinent, the judge stated that he had this note of inquiry from the jury: "If the defendant were aware that the bonds which he aided in disposing of were stolen does that knowledge make him guilty on the second count." In answer the judge instructed the jury as follows: "Of course if it occurred afterwards it would not make him guilty, but in that connection I say to you that if the possession was shortly after the bonds were stolen, after the theft, it is sufficient to justify the conclusion by you jurors of knowledge by the possessor that the property was stolen. And, just a moment—I further charge you that possession of stolen property in another State than that in which it was stolen shortly after the theft raises a presumption that the possessor was the thief and transported stolen property in interstate commerce, but that such presumption is subject to explanation and must be considered with all the testimony in the case." Counsel for the accused excepted to this charge, but the judge cut short an attempted re-

quest by counsel with the remark, "You may except to the charge, but I will not take any requests." The jury filed out and returned five minutes later with a verdict of guilty on the second—the conspiracy—count. A sentence of two years and a fine of $10,000 were imposed. The Circuit Court of Appeals reversed the judgment and ordered a new trial. It found error in the charge just quoted. "Certainly it is untenable to say," was the crux of its holding, "that the possession of stolen goods raises any presumption that they have in fact been transported in interstate commerce." 147 F. 2d 199, 202. And it held that it could not disregard the error because of the questionable evidence as to whether the accused knew that the bonds had come from another State. But on rehearing the court's attention was called to the fact that, after his arrest, the accused admitted that he knew that the bonds had come from the West and that he may have had that knowledge before he disposed of them. On further consideration of the bearing of this evidence upon the defendant's knowledge of the place of the theft, the Circuit Court of Appeals changed its view and held that "it would be altogether unwarranted to reverse the judgment because of the mistake in the charge." 147 F. 2d at 202.

That court evidently felt free to disregard "the mistake in the charge" only on its assumption that Bollenbach could be convicted under this indictment as an accessory after the fact. But Bollenbach was neither charged nor tried nor convicted as an accessory after the fact. The Government did not invoke that theory in the two lower courts and disavows it here. And rightly so. The receipt of stolen securities after their transportation across State lines was not a federal crime at the time of the transactions in question, and we need not consider the scope of a later amendment making it so. See Act of August 3, 1939, 53 Stat. 1178, 18 U. S. C. § 416; H. R. Rep. 422, 76th Cong., 1st Sess. (1939); and S. Rep. 674,

76th Cong., 1st Sess. (1939). Bollenbach could not properly be convicted for the offense for which he was charged and for which he was convicted, namely, for having conspired to transport securities across State lines merely on proof that he was a "fence," *i. e.*, helped to dispose of the stolen securities after the interstate transportation was concluded. While § 332 of the Criminal Code, *supra,* made aiders and abettors of an offense principals, Congress has not made accessories after the fact principals. Their offense is distinct and is differently punished. (§ 333 of the Criminal Code, 35 Stat. 1152, 18 U. S. C. § 551.)

We are therefore thrown back upon an appraisal of what the Circuit Court of Appeals deemed a mistaken charge in the proper setting of this case.

The Government does not defend the "presumption" as a fair summary of experience. It offends reason, so the Government admits, as much as did the presumption which was found unsupportable in *Tot* v. *United States,* 319 U. S. 463, even though that was embodied in an Act of Congress. Instead, the Government in effect asks us to pay no attention to this palpably erroneous answer by the judge to the jury's inquiry as to guilt on the charge of conspiracy to transport stolen securities "If the defendant were aware that the bonds which he aided in disposing of were stolen." We can pay no attention to this misdirection only by assuming that the jury paid no attention to it and that the case is before us as though no misdirection had been given. To do so is to disregard the significance of the course of events, as revealed by the record, after the case went to the jury.

The Government suggests that the judge's misconceived "presumption" was "just what it appears to be—a quite cursory, last minute, instruction on the question of the necessity of knowledge as to the stolen character of the notes—and nothing more." But precisely because it was a

"last minute instruction" the duty of special care was indicated in replying to a written request for further light on a vital issue by a jury whose foreman reported that they were "hopelessly deadlocked" after they had been out seven hours. "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia* v. *United States,* 289 U. S. 466, 469. "The influence of the trial judge on the jury is necessarily and properly of great weight," *Starr* v. *United States,* 153 U. S. 614, 626, and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge.

An experienced trial judge should have realized that such a long wrangle in the jury room as occurred in this case would leave the jury in a state of frayed nerves and fatigued attention, with the desire to go home and escape overnight detention, particularly in view of a plain hint from the judge that a verdict ought to be forthcoming. The jury was obviously in doubt as to Bollenbach's participation in the theft of the securities in Minneapolis and their transportation to New York. The jury's questions, and particularly the last written inquiry in reply to which the untenable "presumption" was given, clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities. Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them

away with concrete accuracy. In any event, therefore, the trial judge had no business to be "quite cursory" in the circumstances in which the jury here asked for supplemental instruction. But he was not even "cursorily" accurate. He was simply wrong.

The Circuit Court of Appeals read the judge's charge to mean that the jury was permitted to find Bollenbach "guilty of a conspiracy to transport stolen notes if he joined in their disposal after the transportation had ended." We so read it. That court, as we have seen, properly rejected the propriety of leaving the case to the jury as the trial judge had left it, but sustained the conviction on its own accessory-after-the-fact theory. Compelled to repudiate this theory, the Government now seeks to sustain the conviction on the afterthought that the charge did not mean what it said, and that, while the jury asked one question, the trial judge replied to another. Here then are three different and conflicting theories regarding a charge designed to guide the jury in determining guilt, and yet we are asked to sustain the conviction on the assumption that the jury was properly guided. The Government contends that the court below failed to appreciate several factors in regard to the criticized charge. What reason is there for assuming that the jury did not also fail to appreciate these factors which the Government, in an elaborate argument, explains as requisite for a proper understanding of that which at best was dubiously expressed? A conviction ought not to rest on an equivocal direction to the jury on a basic issue. And a charge deemed erroneous by three circuit judges of long experience and who have a sturdy view of criminal justice is certainly not better than equivocal. The Government's suggestion really implies that, although it is the judge's special business to guide the jury by appropriate legal criteria through the maze of facts before it, we can say that the lay jury will know enough to disregard the judge's

bad law if in fact he misguides them. To do so would transfer to the jury the judge's function in giving the law and transfer to the appellate court the jury's function of measuring the evidence by appropriate legal yardsticks.

The Government argues that the sting of error is extracted because there was proof, other than the erroneous "presumption," on the issue of Bollenbach's participation in the wrongdoing before the transportation of the stolen securities had ended. This is to disregard the vital fact that for seven hours the jury was unable to find guilt in the light of the main charge, but reached a verdict of guilty under the conspiracy count five minutes after their inquiry was answered by an untenable legal proposition. It would indeed be a long jump at guessing to be confident that the jury did not rely on the erroneous "presumption" given them as a guide. A charge should not be misleading. See *Agnew* v. *United States,* 165 U. S. 36, 52. Legal presumptions involve subtle conceptions to which not even judges always bring clear understanding. See Thayer, *Preliminary Treatise on Evidence* (1898) Chaps. 8 and 9; Wigmore, *Evidence* (3d ed., 1940) §§ 2490–2540; Morgan, *Some Observations Concerning Presumptions* (1931) 44 Harv. L. Rev. 906; Denning, *Presumptions and Burdens* (1945) 61 L. Q. Rev. 379. In view of the Government's insistence that there is abundant evidence to indicate that Bollenbach was implicated in the criminal enterprise from the beginning, it may not be amiss to remind that the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts.

Accordingly, we cannot treat the manifest misdirection in the circumstances of this case as one of those "technical errors" which "do not affect the substantial rights of the parties" and must therefore be disregarded. 40 Stat. 1181, 28 U. S. C. § 391. All law is technical if viewed solely from concern for punishing crime without heeding the mode by

which it is accomplished. The "technical errors" against which Congress protected jury verdicts are of the kind which led some judges to trivialize law by giving all legal prescriptions equal potency. See Taft, *Administration of Criminal Law* (1905) 15 Yale L. J. 1, 15. Deviations from formal correctness do not touch the substance of the standards by which guilt is determined in our courts, and it is these that Congress rendered harmless. *Bruno* v. *United States,* 308 U. S. 287, 293–94; *Weiler* v. *United States,* 323 U. S. 606, 611.[1] From presuming too often all errors to be "prejudicial," the judicial pendulum need not swing to presuming all errors to be "harmless" if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be.

*Judgment reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

*Tot* v. *United States,* 319 U. S. 463, held that the mere possession of a pistol coupled with conviction for a prior

---

[1] Compare the applications by the English courts of a similar provision in the Criminal Appeal Act, 1907: *Maxwell* v. *Director of Public Prosecutions,* [1935] A. C. 309; *Rex* v. *Leckey,* [1944] 1 K. B. 80; *Rex* v. *Slender,* 26 Crim. App. Rep. 155 (1938); *Rex* v. *Redd,* [1923] 1 K. B. 104; *Rex* v. *Watson,* [1916] 2 K. B. 385; *Rex* v. *Ahlers,* [1915] 1 K. B. 616; *Rex* v. *Thompson,* [1914] 2 K. B. 99; *Rex* v. *Edwards,* [1913] 1 K. B. 287; *Rex* v. *Rodley,* [1913] 3 K. B. 468; *Rex* v. *Ellis,* [1910] 2 K. B. 746; *Rex* v. *Dyson,* [1908] 2 K. B. 454; *cf. Bray* v.

crime was not evidence proving that the pistol had been shipped or transported in interstate commerce. I agree with the government's contention that the trial court's charge in this case does not conflict with the *Tot* holding. For the trial court did not charge the jury that interstate transportation of the stolen securities could be inferred from their mere possession in New York. In fact, the undisputed evidence showed that the securities, stolen in Minnesota, turned up in the petitioner's possession in New York very shortly after the theft. No evidence was offered to explain this possession of the stolen goods. Under these circumstances the trial judge rightly charged the jury that the unexplained possession of stolen property shortly after the theft was sufficient to justify a finding that the petitioner not only knew that the bonds were stolen but that he was the thief. Such seems to have been the established rule of law since time immemorial.[1]

Never until today has this Court cast any doubt on the existence or soundness of the rule. In fact it has recognized or expressly approved it as proper in cases involving larceny, *Dunlop* v. *United States,* 165 U. S. 486, 502; burglary, *McNamara* v. *Henkel,* 226 U. S. 520, 524–525; arson, *Wilson* v. *United States,* 162 U. S. 613, 617, 619, 620; and even murder, *ibid.* And in the *Wilson* case, *supra,* this Court approved a charge by the trial court using substantially the same language as to "presumption," which the trial court here used.[2] There is no reason which I can

*Ford,* [1896] A. C. 44. And see *Makin* v. *Attorney General,* [1894] A. C. 57, construing a similar provision in the Criminal Law (Amendment) Act, 1883.

[1] See the cases collected in notes on *Hunt* v. *Commonwealth,* 70 Am. Dec. 443, 447–452; *State* v. *Drew,* 101 Am. St. Rep. 474, 481–524.

[2] The court's charge here condemned was that unexplained possession "raised a presumption." It may be, although I am not sure, that the condemnation rests on the use of the word "presumption" instead of "inference." And it is true that fine-spun refinements have been invented in efforts to distinguish "presumptions" from "infer-

conceive, and the Court offers none, why the sensible and long-established rule should be appropriate in all kinds of cases except the one before us. Certainly evidence of the theft of the bonds and their transport in interstate commerce with knowledge of the theft, was relevant on both counts of the indictment, the first charging the theft and transportation, and the second charging conspiracy to commit the crime. And these relevant facts were capable of proof by circumstantial evidence to the same extent as to each count. The "unexplained possession" rule is in substance a circumstantial evidence rule. The experience of ages has justly given this particular type of circumstantial evidence a high value. In my opinion the trial court's charge insofar as it stated that unexplained possession of the stolen bonds raised a "presumption" that

ences," cf. *New York Life Ins. Co.* v. *Gamer,* 303 U. S. 161, 175–177. But I am sure that this jury was not familiar with the dialectics which sought without success to deliver these metaphysical distinctions from foetal darkness. And the notes already cited, as well as many cases, have shown that no such practical distinction exists. See e. g. *United States* v. *Di Carlo,* 64 F. 2d 15, 17; *United States* v. *Seeman,* 115 F. 2d 371, 374. That the trial judge treated a "presumption" as an inference, just as any juror would, is shown by an earlier part of his charge as follows: "It is the law that the unexplained possession of stolen property shortly after the theft is sufficient to justify the conclusion by a jury of knowledge by the possessor that the property was stolen." And it is interesting to note that this Court said in the *Wilson* case, *supra,* at 619–620, that "In *Rickman's case,* 2 East P. C. 1035, cited, it was held that on an indictment for arson, proof that property was in the house at the time it was burned, and was soon afterwards found in the possession of the prisoner, raises a probable *presumption* that he was present and concerned in the offence; and in *Rex* v. *Diggles,* (Wills Cir. Ev. *53,) that there is a like *presumption* in the case of murder accompanied by robbery. Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of his death is always admissible, and the fact, with its legitimate *inference,* is to be considered by the jury along with the other facts in the case in arriving at their verdict." (Italics supplied.)

petitioner was the thief, was a correct statement of law under our former decisions. The Court's opinion does not explicitly repudiate this part of the trial judge's instruction but it seems to me that such repudiation is implicit in the Court's reasoning.

There is some indication in the Court's opinion that it thought the entire answer to the jury's question erroneous because it was misleading. The only reason, I can imagine, why the Court's answer, stating this well-established rule, could be thought misleading, is that the answer was in response to a question on the conspiracy count. Thus the Court may be saying that the jury might have believed from the trial court's instructions that unexplained possession is not only proof that petitioner was the thief but also is in and of itself proof that he was a conspirator. In view of the fact that the judge previously fully instructed the jury on conspiracy, I do not think it either possible or probable that the jury was misled in the way indicated. But my objection is chiefly to the Court's repudiation, either partial, or complete, of a rule which permits courts and juries to draw perfectly justifiable inferences from proven facts.

Nor do I think the trial judge was wrong in instructing the jury that the unexplained possession in New York of the securities recently stolen in Minnesota justified an inference that the petitioner had transported them in interstate commerce. If this possession in New York justified an inference that he had stolen the securities in Minnesota, I fail to see why it does not also justify the inference that he carried them to New York. Can it be said that there is a presumption that he stole them in Minnesota and then passed out of the picture while the stolen goods were carried to New York, and that the jury was compelled to attribute his possession in New York to something as indefinite as an "Act of God or the public enemy"? The very presumption of theft has to carry with it the presumption of transportation. Thieves do not remain at the scene of their

crime. The classical definition of larceny contains the phrase "a felonious taking and carrying away."

The Bill of Rights is improperly invoked to support the Court's holding in this case. It contemplates that a defendant shall have a fair trial, but it does not command that juries shall be denied the right to draw the kind of inferences from admitted facts that all people of reasonable understanding would draw. I assume that if these bonds had been stolen in Minneapolis, Minnesota, at 6 A. M., and this petitioner had turned up with them just outside the New York airport at 12 o'clock noon of the same day, a reasonable person could not only infer that he had stolen them, but also that he had transported them. The only difference between drawing an inference of transportation in that case and the one before us is that the inference of transportation here might not be quite so overpowering. But it is none the less a reasonable one.

The trial judge's oral charge to the jury was clear, fair, correct, and unchallenged. I disagree with the Court's censure of his additional instructions.[3] The jury's verdict, given after a fair trial, was supported, if not compelled, by the evidence. It is, in my judgment, a disservice to the administration of criminal law to reverse this case.

---

[3] This Court reads the trial judge's charge to mean that Bollenbach was "guilty of a conspiracy to transport stolen notes if he joined in their disposal *after the transportation had ended*." The trial judge actually charged the jury thus: "If the participation of this defendant in this was *subsequent*, that is, that he did not know that they were transported, that is, if he did not transport them or cause them to be transported himself, of course there would be no offense. That is, if the bonds arrived in New York and he had nothing to do with transporting or causing them to be transported there would be no offense." Later the jury asked the judge this question: "If the defendant were aware that the bonds which he aided in disposing of were stolen does that knowledge make him guilty on the second count?" The judge's reply so far as relevant to this particular question was: "Of course if it occurred *afterwards* it would not make him guilty . . ." Not one word and not one intimation have I been able to discover in the instructions to the jury to the effect that Bollenbach could be convicted if he had done no more than join in disposal of the bonds *after* their transportation had ended.