**UNITED STATES**

v.

**Charles A. BUCKROTH, 028 52 6335, Seaman Recruit (E–1), U. S. Navy.**

**NMCM 81 0250.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 31 July 1980.

Decided 30 Nov. 1981.

LT Thomas P. Murphy, JAGC, USNR, Appellate Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

Before BAUM, Senior Judge, and ABERNATHY and KERCHEVAL, JJ.

ABERNATHY, Judge:

At general court-martial before members appellant faced charges alleging violations of Articles 81, 108, 110 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 908, 910 and 928. He pled guilty under Article 81, UCMJ, to conspiring to assault a fellow-crewmember; under Article 108, UCMJ, to willfully damaging his ship, the USS *Barnstable County* (LST 1197), by pouring paint down her outer sides. He entered not guilty pleas under Articles 81, 108, 110 and 128, UCMJ, thereby denying his participation in the following events: (1) a conspiracy to damage the ship's aftersteering units; (2) the destruction, through contamination with paint remover, of the hydraulic fluid in the ship's aftersteering units; (3) the hazarding of the vessel; and (4) an assault upon a fellow-crewmember. He was found guilty of all charges and specifications and was sentenced to be confined at hard labor for four years, to forfeit all pay and allowances and to be dishonorably discharged from the Naval Service. The findings and sentence were approved on review below and we affirm.

The factual background to this case as brought out at trial is as follows:

On 23 January 1980, appellant and co-conspirators assaulted a fellow-crewmember. When the commanding officer informed them that they would go to special court-martial for the offense, appellant and his fellows conspired to embarrass the captain by damaging the ship's aftersteering units in the early hours of 1 February 1980,

and thereby cause the ship to run into the pier during docking maneuvers later that morning.

The evidence of appellant's involvement in the criminal acts subsequent to the assault came in at trial primarily through the testimony of his fellow-conspirator, L. However, petty officers O. and A. testified that on 31 January 1980, they saw appellant and L. carrying full laundry bags toward the after-steering spaces from the direction of the ship's flammable liquids locker, a space to which appellant had unrestricted access. O. asked appellant what was in his bag. Appellant responded it would be better if O. didn't know. Shortly thereafter, L. told O. they were carrying paint remover and planned to ruin some paint jobs on the after decks. Later that night, according to L., appellant, L. and the third co-conspirator, J., took the paint remover from where they had hidden it near aftersteering and dumped two to three gallons into the port and starboard steering units. The following morning, 1 February 1980, as the ship was steaming into port, a crewmember spotted foaming, consistent with the alleged contamination, in one of the aftersteering pumps. Upon receiving the report of trouble in aftersteering the captain had the unit shut down and switched to an auxiliary system. This occurred as the ship was steaming amidst other vessels in a 20–25 knot wind up a 200-yard wide channel. The ship was steaming at two-thirds speed. At full speed, she would have required in excess of 270 yards to come to a dead stop. It was under these conditions that the captain of the ship was denied control of a main navigational system.

Appellant has assigned ten errors for our consideration. We consider the first nine to have no merit but believe five of those to be worthy of discussion. The first two assignments of error go to the heart of this case.

I

THE COMPETENT EVIDENCE OF RECORD FAILS TO PROVE BEYOND A REASONABLE DOUBT THAT THE SUBSTANCE ALLEGEDLY INTRO-DUCED INTO THE SHIP'S AFTER-STEERING UNITS DETERIORATED, OR IN ANY WAY ADVERSELY AFFECTED, THE HYDRAULIC OIL.

A. THE GOVERNMENT EXPERT WITNESS COULD NOT IDENTIFY THE FOREIGN SUBSTANCE IN A SAMPLE OF THE SHIP'S HYDRAULIC OIL, THEREFORE, HIS TESTING OF THE SAMPLE FOR METHOLINE CHLORIDE, THE ACTIVE AGENT IN AN ALLEGED NAVY-WIDE PAINT REMOVER, WAS OF NO CREDIBLE WEIGHT IN THAT THERE WAS NO EVIDENCE AT TRIAL THAT (1) THE PAINT REMOVER TESTED IS IN FACT USED NAVY-WIDE, AND (2) THAT THE PAINT REMOVER MAINTAINED ABOARD THE SHIP, OR ALLEGEDLY POURED INTO THE AFTERSTEERING UNITS, WAS THE NAVY-WIDE BRAND.

B. THE MILITARY JUDGE ERRED IN NOT *SUA SPONTE* INSTRUCTING THE MEMBERS TO DISREGARD PROSECUTION EXHIBIT 2 FOR IDENTIFICATION, AND ALL TESTIMONY RELATING TO IT.

A.

At trial, the Government's specialist in chemistry testified that, in relation to the instant case, he had found metholine chloride contaminating the hydraulic oil in the aftersteering units of the *Barnstable County*; that metholine chloride was not naturally found in hydraulic oil; that the paint remover used widely by the Navy contained concentrations of metholine chloride in excess of 70%; that the paint remover he obtained from the *Barnstable County* contained concentrations of metholine chloride in excess of 85%; and that the effect of adding metholine chloride-based paint remover to the hydraulic oil in aftersteering would be to contaminate and dilute the oil. (R.127–128). Through the testimony of the chemist, the Government specialist in aftersteering units, who also found the oil to be seriously contaminated, and the captain of the ship, it was made clear that the

potential effects of appellant's crime would be a loss of lubrication in the system, clogging in the filters, a breakdown of the pumps, and a loss of steering control. In view of the foregoing, we find the Government's evidence on the issue to have been substantial and entirely credible. Further, actual deterioration of the lubricating quality of the oil is not necessary to proof of hazarding a ship. All that is required is the potential for it.

### B.

■ The Prosecution Exhibit mentioned in part B of the first assignment of error consisted of two bottles. One contained the contaminated hydraulic oil that had been tested by the chemist testifying for the Government. The other, which was opaque, contained a waxy precipitate matter floating on the oil. This was not tested prior to trial. It was described by both the Government and defense experts as appearing to be a precipitate of the sort to be expected in this variety of contamination. (R.129, 169). Neither bottle was admitted into evidence although the members were aware of the contents. At trial, both bottles were identified by the Naval Investigative Service (NIS) agent, who initially extracted the contents from the ship's aftersteering units, by the NIS evidence custodian, and by the chemist. Given the fact that neither bottle was admitted into evidence and that there was more than sufficient testimonial evidence to establish the contaminated condition of the oil without the introduction of those samples at trial, we see no need for the military judge to have given the argued-for instruction. What the members actually saw in the one transparent bottle was oil contaminated with a soluble substance indistinguishable to the untrained eye from the oil itself. We find no prejudice to appellant from the unrestricted appearance of those bottles at trial. *United States v. Penn*, 4 M.J. 879 (N.C.M.R.1978).

### II

In his second assignment of error, appellant argues:

THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION FOR A FINDING OF NOT GUILTY TO CHARGE III, HAZARDING A VESSEL, IN THAT THERE WAS NO EVIDENCE THAT THE AFTERSTEERING UNITS, OR THE SHIP, WERE PUT IN DANGER OF LOSS OR INJURY.

■ For the second time in recent months, this Court has before it a case involving the hazarding of a U. S. naval vessel. In deciding whether or not the ship was hazarded through appellant's actions, we apply to the facts of this case the same reasoning which we most recently applied in *United States v. Tusing*, 12 M.J. 608 (N.M.C.R. 1981), and which has been applied before in *United States v. Adams*, 42 C.M.R. 911 (N.C.M.R.1970) and in *United States v. MacLane*, 32 C.M.R. 732 (CGBR 1962). That reasoning goes to the element of risk. That element is the center around which the law of hazarding revolves. It is defined in paragraph 189, *Manual for Courts-Martial, 1969 (Rev.)* (MCM) as "put(ting) in danger of loss or injury." In *Adams*, the Court found the accused had hazarded the vessel when he subjected her to the risk of injury or loss by setting fire to some mattresses on board. In *Tusing*, we went a step further and found the accused hazarded his ship when he subjected her to the risk of fire by cutting electrical wires. In the instant case, as in *MacLane*, the risk created was to the navigational capabilities of the ship.

The law has recognized "the necessity for maintaining a very ·high standard of care and responsibility for the safe navigation of a vessel at sea." *MacLane* at 735. This standard was codified as early as 1799· with the publication of Article 42 of the first Articles for the Government of the Navy:

Care shall be taken in steering and conducting every ship belonging to the United States, so that through willfulness, negligence, or other defaults, no ship be stranded or hazarded, upon pain that such as shall be found guilty therein, be punished as the offense, by a court-martial, shall be judged to deserve. (1 Stat. 713).

*Id.* The standard, more recently codified in Article 110, U.C.M.J. "makes a person punishable for merely risking (hazarding) an item of property quite irrespective of resultant damage." *Id.*[1]

Appellant's brief cites to *United States v. Parks*, 3 M.J. 591 (N.C.M.R.1977), for the proposition that appellant's actions did not risk or hazard his ship. In *Parks* the Court found that the accused's jumping overboard was akin to a breach of the peace. *Id.* at 592. That the ship was forced to divert from its course to rescue him did not hazard the vessel. There the Court stated that "under ordinary circumstances maneuvering a ship in order to recover a man overboard does not put the ship in probable danger of loss or injury." *Id.* Appellant argues that "[t]he [captain's] cautious shutting down of the port aftersteering unit, and switching to a standby unit, was no doubt as common a sea evolution as a man overboard drill." Appellant's brief at 14. This analogy fails for two reasons: First, it ignores the limiting effects of the phrase "under ordinary circumstances." In a strong wind, in a narrow channel in the midst of traffic, the circumstances for carrying out sea evolutions are not ordinary. Had the wind, sea and traffic conditions in *Parks* been as they were in the instant case, we would have found that the accused's actions had hazarded his ship. Second, appellant's analogy ignores the fact that, as was not the case in *Parks*, appellant's actions helped remove part of a major navigational system from the control of the captain. This put the ship at risk.

We find beyond a reasonable doubt that appellant's actions, in damaging the hydraulic oil through contamination, hazarded

the *Barnstable County*. That the injury done to the aftersteering units did not result in the ship's running aground or losing all navigational capabilities is irrelevant. "The crux of [an Article 110, UCMJ,] offense · is the *hazarding* of a vessel either willfully or negligently, not the stranding." (Emphasis in the original). *MacLane* at 735.

### III

In his fifth assignment of error, appellant argues that:

THE MILITARY JUDGE ERRED IN EXCLUDING EVIDENCE THAT THE CHIEF GOVERNMENT WITNESS, [L.], HAD OFFERED A BRIBE TO A SHIPMATE TO FABRICATE AN ALIBI FOR HIMSELF.

■ The defense's aim at trial was to discredit the Government's chief witness, L. In furtherance of this aim, trial defense counsel attempted to introduce the testimony of the individual L. had planned to bribe. The Government's objection took the form of a motion *in limine* citing paragraph 153(*b*)(2), MCM. The relevant sections read:

In general it is not permissible, except on cross-examination of a witness who is not the accused, to impeach a witness on the ground the he has committed an offense involving moral turpitude or otherwise affecting his credibility by adducing evidence of the offense not amounting to proof of conviction thereof.

At trial the defense argued for admissibility of the testimony on the basis of paragraph 153(*b*)(2)(d), MCM:

---

**1.** The discussion in paragraph 189 of the *Manual for Courts-Martial, 1969 (Rev.)*, on hazarding a vessel is most readily applicable to the fate of those ships venturing out upon the seas. But the *Uniform Code of Military Justice* (UCMJ) does not preclude, and indeed we may envision, the day when a Charge brought under Article 110, UCMJ, is successfully prosecuted in an instance where the vessel hazarded is a military air- or space-craft. That probability comes home with special force in the reports of the difficulties—remarkably similar to those we have before us in this case—which recently

delayed the second flight of the space shuttle *Columbia*. In the case of the *Columbia*, contaminated oil clogged the filters feeding lubricating oil to the spacecraft's hydraulic lines. The lines jammed just before liftoff. The jamming "could have been disastrous if it had happened in flight...." "Shuttle Launch is Delayed 1 Week By Oil Flilter Clog," *The Washington Post*, Nov. 5, 1981, at A1, col. 4; "Space Shuttle Flights May Fall Farther Behind Schedule," *Id.*, November 6, 1981, at A23, col. 1.

(d) Prejudice and bias. Former quarrels, relationship, friendship, or illicit relations with the accused and other matters showing prejudice, bias, or any motive to misrepresent may be shown to diminish the credibility of the witness, either by cross-examination of the witness himself or by evidence otherwise adduced.

We agree with the military judge that the defense theory on bias was inapplicable to the facts of this case. (R.155, 156). We are further persuaded by the Government that L., having "already been court-martialed for his involvement in these offenses" (Government brief at 10), lacked a motive to misrepresent the facts. In fact, we do not see how the substance of the testimony in question had any relation to any motive for L. to lie. What it might have shown was L.'s willingness to lie, but as an illustration of that tendency, it would have had to have come in during cross-examination of L. The judge in no way foreclosed that option. In fact, he reminded the defense that they might elicit the relevant testimony from L. himself. (R.157). This the defense declined to do. The evidence of L.'s bribery attempt might have been used to impeach his credibility had he lied in relation to the bribe. But as the Government notes, this was not the case. The following exchange took place at trial before the members:

ICC: Another term of the pretrial agreement is that the Government would not proceed against you on a charge of influencing the testimony of a witness, isn't that correct?

L.: Yes, that is correct.

(R. 104).

The defense was given full opportunity to question L. further about the bribe. They chose not to. That opportunity was sufficient. No remedial action is required at this level.

### IV

Appellant's sixth assigned error assumes that:

THE MILITARY JUDGE ABANDONED HIS IMPARTIAL ROLE, AND USURPED THE FACTFINDING POWER OF THE MEMBERS, BY INSTRUCTING THE MEMBERS THAT THE CHIEF GOVERNMENT WITNESS, [L.], MADE A CONFIRMING STATEMENT BEFORE A MOTIVE TO LIE AROSE.

The confirming statement referred to is that in which L. volunteered to NIS the fact that he and two fellow-crewmembers had contaminated the hydraulic oil in aftersteering. L. made this statement before any charges had been preferred against him and before he had obtained a pre-trial agreement.

 It is a point of law that "while the military judge may, and sometimes should, clarify ambiguities, he may not, of course, become an advocate." *United States v. Eckert*, 8 M.J. 835, 838 (A.C.M.R.1980). The question before us is whether the military judge stepped beyond the bounds of clarification and into the realm of prosecutorial advocacy. We find he did not. Appellant cites two cases in support of his contention but we find the court's instruction to the members was not the manifest misdirection condemned in *Bollenbach v. United States*, 326 U.S. 607, 614, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946); nor was it the exercise in deprecation by inference disapproved in *United States v. Clower*, 23 U.S.C.M.A. 15, 48 C.M.R. 307 (1974). In the instant case, the judge did not even go so far as to wrongly rehabilitate a shaky prosecution witness. *United States v. Wilson*, 2 M.J. 548 (A.C.M.R.1976). The Government's witness, L., had given internally consistent testimony. That testimony had gone unrebutted. From our reading of the record, the purpose and effect of the instruction under consideration was to clarify for the members the sequence in which a series of statements transpired. To the extent that the instruction involved any findings of fact in relation to L.'s alleged motive to lie those findings had already been accepted and stated during cross-examination by the defense. (R. 103–104). We find neither prejudice nor error in the instruction given by the military judge.

## V

Appellant's eighth assignment of error alleges that:

THE MILITARY JUDGE ERRED BY EQUATING SUBSTANTIAL DOUBT AND REASONABLE DOUBT IN HIS INSTRUCTION TO THE MEMBERS.

 In any trial subsequent to the holding in *United States v. Salley*, 9 M.J. 189 (C.M.A.1980), a judicial instruction equating reasonable doubt with substantial doubt would be error, although not necessarily prejudicial to the accused. *United States v. Moss*, 10 M.J. 329 (C.M.A.1981). Although on review appellant has alleged that the now erroneous instruction has worked to his prejudice, he does not suggest how. Our own reading of the record does not provide us with any independent evidence that appellant suffered harm. In light of this, we reject appellant's argument on remedy.

## VI

Appellant's final assignment of error, which we find to have merit, argues that:

THE CONVENING AUTHORITY'S ACTION FAILS TO NOTE THE SEPARATE TRIALS OF THE COMPANION CASES.

As appellant and Government note, "the convening authority's action fails to reflect the companion cases per paragraph 0123*a*, *The Manual of the Judge Advocate General.*" (Government brief at 13). A corrected supplementary court-martial order should be issued to correct this discrepancy.

In light of the foregoing, the findings and sentence as approved on review below are affirmed.

Senior Judge BAUM and Judge KERCHEVAL concur.