STATE

v.

Anthony F. GOMES.

No. 90–92–C.A.

Supreme Court of Rhode Island.

April 16, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Joseph P. Youngs, III, Special Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

SHEA, Justice.

This case comes before the Supreme Court on the defendant's appeal from his conviction of manslaughter entered after a jury trial. We vacate the judgment of conviction and remand for a new trial.

There were no actual eyewitnesses to this double stabbing that left Shirley Dean Wilkerson dead and Anthony F. Gomes hospitalized and charged with manslaughter. However, Wilkerson's niece, Meredith Irons (Irons), and Irons's boyfriend, Christopher Harrell (Harrell), were the first witnesses to arrive at Wilkerson's bloodied apartment as the confrontation between Wilkerson and Gomes drew to a close.

Shirley Wilkerson (Wilkerson) and Anthony F. Gomes (Gomes) lived at 52 Berkshire Street in Providence, Rhode Island. The residence, which was owned by Wilkerson, was a two-family residence. Wilkerson lived with Gomes in the first-floor apartment, and Irons and Harrell occupied the second-floor apartment.

In the late evening of March 24, 1987, Irons returned to her apartment at approximately 11:55 p.m. Minutes later, she heard noise downstairs and said to herself, "[I]t's Aunt Shirley and Tony fighting again." Then she heard Wilkerson yell, "Mert, Mert!" On hearing this cry, Irons awakened Harrell and together they went downstairs to Wilkerson's apartment. When Irons knocked on the door, she heard Gomes scream, "She has a knife. I don't want to hurt her because I love her." The door was unlocked. Irons and Harrell entered the apartment and discovered Gomes and Wilkerson struggling in the corner of the living room. Wilkerson was bent backward over the television set as Gomes apparently held her down. According to Har-

rell, Gomes was "slumped over Shirley at the television set and they were struggling with a knife."

Irons ordered Gomes to release Wilkerson and then went to the bathroom for towels since Gomes was bleeding profusely. When she returned from the bathroom, Gomes was still positioned over Wilkerson with her body bent backward over the television. At this point Irons once again ordered Gomes to release Wilkerson. Gomes complied, whereupon Wilkerson, who had a gash under her eye and blood on her shirt, stormed out of the apartment, accusing, "See what you did. You cut my face." When Gomes released Wilkerson, both Irons and Harrell observed a knife in Gomes's right hand, but neither Irons nor Harrell actually saw either Gomes or Wilkerson stab the other.

Gomes was bleeding profusely with blood gushing from his neck and back. Harrell conceded, "It was bad * * * I thought he would die actually." Harrell followed after Wilkerson, but by the time he reached the door to the apartment, Wilkerson was nowhere to be seen. Harrell reentered the building where by this time Gomes was seated in the stairway outside the door of his apartment. When Harrell removed the knife from Gomes's right hand, Gomes lamented, "I didn't mean to hurt her." Neither Harrell nor Irons observed any wounds on Wilkerson's body except for the gash under her eye.

When the Providence police and rescue team arrived, a view of the first-floor apartment revealed evidence of a substantial struggle. There was blood on the floor and the walls of the kitchen, the living room, and the bedroom. Furniture was overturned. A chef's knife, dripping with blood, was found stuck in a step in close proximity to the place where Gomes was sitting. It was identified at trial as the same knife that Irons and Harrell had observed in Gomes's right hand. Wilkerson was discovered collapsed on the front porch behind the open door. Officer Patricia Iadevaia observed that Wilkerson lay unconscious in a pool of blood. She appeared to have received a wound in the abdomen.

Wilkerson was pronounced dead on arrival at the hospital at 1:01 a.m.

Officer Roy Persson of the Providence police department investigated the crime scene. Although he seized the chef's knife and processed it for fingerprints, the fragments of fingerprints were not classifiable or identifiable. Laboratory analysis revealed that the blood on the chef's knife seized by police was type O.

Medical examiner Kristen Sweeney testified that an external examination of Wilkerson's body revealed multiple superficial cuts predominantly on the left side of her face and on the back of her fingers. A large stab wound, visible in the upper abdomen slightly to the right of the midline, measured 1⅞ inches. The autopsy examination of the abdominal wound revealed that a sharp object had passed through the underside of the liver, which caused considerable bleeding. The path of the wound was front to back, somewhat upward and also somewhat left to right. She estimated the depth of the wound to be between nine and ten inches. Laboratory tests revealed Wilkerson's blood type to be O positive. The doctor testified, "The cause of death was a stab wound of the abdomen."

Gomes testified at trial. He explained that although he and Wilkerson had intended to get married, their relationship had often been stormy. Apparently Wilkerson was in the habit of venting her anger violently on Gomes. Three months prior to the fatal night, Wilkerson attacked Gomes and cut him across his face and throat. On another occasion in February of 1987, Wilkerson, without provocation, stabbed Gomes in the chest with a butcher knife, puncturing a lung, which injury resulted in Gomes's hospitalization.

The final attack occurred in the late evening of March 24, 1987. Gomes had been asleep, and he was awakened by Wilkerson a short time after 11 p.m. Wilkerson was angry, and they began to argue. Gomes testified that she made him so nervous that he consumed a pint of vodka. Wilkerson had also been drinking. In fact, both were intoxicated: Gomes's blood-alcohol level

measured .339, and Wilkerson's measured .19.

When Gomes finished the vodka, he lay face down on the bed. Moments later Gomes felt a knife penetrate his back. Apparently without provocation, Wilkerson had stabbed Gomes again—puncturing his lung for the second time in a month. "They said the knife went in my back about six or seven inches," testified Gomes. He then fought to turn over onto his back and a substantial struggle for the knife ensued. Although Gomes and Wilkerson were about the same height, about five-feet, eight inches tall, Wilkerson weighed 164 pounds while Gomes weighed 116 pounds. Gomes described the events:

"She pinned me back down. She had the knife about that close to my heart, and I was bleeding like a pig then already. Her hand started to slip—excuse my expression, but I was scared as hell. I don't know where I got the strength from, [but] I pushed her hand back."

As Gomes attempted to free the knife from her hand, Wilkerson jerked away and accidentally stabbed herself in the pit of her stomach. According to Gomes, after Wilkerson was stabbed, "She just went wild." She "flailed" the knife in rage and as a consequence slashed Gomes on the side of his face. Finally her hand slowly opened, whereupon Gomes grabbed the knife and threw it to the other side of the room. At that point, Gomes collapsed. He was not aware of Wilkerson's death until three days later. Neither did he recall the struggle that allegedly occurred in the living room. He only remembered arguing and fighting over the knife in the bedroom, and he insisted repeatedly that he had never stabbed Wilkerson but that she stabbed herself accidentally.

Over objection, the trial justice charged the jury on both voluntary and involuntary manslaughter. The jury was instructed as follows:

"[W]e define manslaughter as the unlawful killing of a human being without malice aforethought, either expressed or implied. * * * Now, involuntary manslaughter, that's defined as an intentional homicide, without malice aforethought, committed in the heat of passion, arising as a result of adequate legal provocation. Involuntary manslaughter is defined generally as an unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence. The negligence must be aggravated, culpable, gross or criminal, a departure from conduct of an ordinarily prudent and careful individual." [1]

After deliberating for ninety minutes, the jurors returned to the courtroom. In addition to requesting a restatement of the definition of manslaughter, they also asked the question, "Is [the defendant] guilty of manslaughter if the injury was accidental?" The trial justice, in answer to the jury's question, simply repeated the instructions on voluntary and involuntary manslaughter and additionally stated:

"Now, to answer your question, is he guilty of manslaughter if the injury was accidental? You, as jurors, from the facts, must make a determination whether or not those facts, if you believe certain facts that were committed were either in the performance of an unlawful act not amounting to a felony, or the performance of a lawful act with criminal negligence. So, to answer yes or no specifically to whether an individual is guilty of manslaughter if the injury was accidental, has to be determined by the definitions I've given you. And it's those definitions that guide you as to whether or not this individual is or is not guilty of the charge brought by the State."

---

1. We recognize that the trial justice not only mislabeled the definition of voluntary manslaughter as involuntary manslaughter, but also erroneously applied a civil-negligence standard to the crime of involuntary manslaughter. Involuntary manslaughter requires criminal negligence; that is, the defendant's conduct must be aggravated, willful, gross, wanton, or reckless—not simply a departure from the conduct of an ordinary, prudent, and careful individual. The trial justice, however, when reinstructing the jurors at their request, redefined manslaughter correctly. Nevertheless, we reverse on other grounds.

The defendant objected to both the lack of responsiveness to the jury's question and the confusing nature of the supplemental charge. After another ninety minutes of deliberations, during which the jury again returned to the courtroom to ask for Wilkerson's height and weight, a verdict of guilty was returned. On appeal Gomes contends that the trial justice committed prejudicial error by failing to respond adequately to the jury's question. In support of this contention he argues that this inadequacy and the confusing nature of the supplemental instruction resulted in the jury's misapprehension of the law and, therefore, that the verdict was improper.

 When the jury indicates to the trial justice that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused, the justice is obligated to clarify the matter for the jury in a concrete and unambiguous manner. *See Leonardo v. People*, 728 P.2d 1252, 1256 (Colo.1986). In the case at bar, the jury, faced with the task of determining defendant's guilt or innocence, was obviously confused by the relationship between an accidental killing and defendant's criminal liability. Certainly the evidence presented at trial supported a finding by the jury that Wilkerson's death may have been the result of an accident or a consequence of self-defense. The record is replete with Gomes's assertions that he never stabbed Wilkerson. Moreover, there were no witnesses who actually saw Gomes stab the victim. Additionally, the record demonstrates that Wilkerson had violently attacked Gomes on two prior occasions inflicting life-threatening injuries. In light of this evidence and Wilkerson's unprovoked, vicious attack on the fatal night while Gomes slept, the jurors had it well within their province to conclude either that Wilkerson stabbed herself or that Gomes stabbed her accidentally or in self-defense.

 Under the law of Rhode Island self-defense constitutes legal justification and thus is an affirmative defense to the crime of voluntary manslaughter. Similarly an accidental killing in the absence of criminal negligence legally excuses a defendant from liability for the crime of involuntary manslaughter. We do not overlook the fact that Gomes failed to assert self-defense even though the evidence clearly gave rise to such an assertion. Nevertheless, even in the absence of an instruction on self-defense, the jury was entitled to consider the possibility of an accident as a legal excuse, relieving defendant of a guilty finding on the charge of involuntary manslaughter. Therefore, when the jury returned with the question, "Is [the defendant] guilty of manslaughter if the injury was accidental?" it is apparent that the jury was uncertain about the legal implications flowing from the real possibility that the victim's death had been accidental. The nature of the inquiry alone demonstrates the jury's failure to comprehend the original instruction and the resultant need for clarification.

Faced with such obvious confusion, the trial justice was obligated to do more than reiterate the principal charge that never addressed legal excuse or justification. If it had been apparent that the jury simply overlooked some portion of the original instruction or if the jurors' confusion could have been adequately addressed by directing their attention to the original instructions, then repetition of those instructions would have sufficed and additional instruction would have been unnecessary. *See* ABA Standards for Criminal Justice, Standard 15–4.3(a)(i) (2d ed. 1980). Here, the jury did not overlook the relevant instructions. Moreover, because those instructions provided no clear answer to the jury's inquiry, it was unlikely that the perplexed jurors would "glean the resolution of their doubts as to the applicable law from reiteration of that very same charge." *People*

v. Miller, *6 N.Y.2d 152, 156, 160 N.E.2d 74, 77, 188 N.Y.S.2d 534, 538 (1959)*.

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354 (1946). In the case at bar the jury expressly conveyed its difficulty to the trial court by means of a direct question. This difficulty stemmed from the jury's confusion regarding a matter of law central to the guilt or innocence of the accused, a matter that would negate a central element of the charged offense. The trial justice, therefore, in addition to clarifying the original charge, should have explained the principle of legal excuse— that an accidental killing in the absence of criminal negligence does not constitute manslaughter. The inadequacy of the response to this critical inquiry, which appears to have resulted in a serious misapprehension of the law by the jury, resulted in serious prejudice to the defendant.

For these reasons the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.