Tajh **MILLER–BEY**, # 192360,
Petitioner,

v.

Wayne **STINE**, Respondent.

No. Civ.A. 99–71537–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 15, 2001.

Todd Miller, Munising, MI, for Petitioner.

Laura G. Moody, Michigan Department of Attorney General Habeas Corpus Division, Lansing, MI, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS[1]

TARNOW, District Judge.

### I. Introduction

Petitioner, Tajh Miller–Bey ("Petitioner"), presently confined at the Alger Maximum Correctional Facility in Munising, Michigan, has filed this *pro se* application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, Petitioner attacks his conviction after a jury trial in the Oakland County Circuit Court of two counts of assault with a dangerous weapon, M.C.L. 750.82, two counts of possession of a firearm during the commission of a felony, M.C.L. 750.227b, and one count of carrying a concealed weapon, M.C.L. 750.227.[2] Petitioner thereafter pled guilty to felon in possession of a firearm, M.C.L. 750.224f, and being a fourth felony habitual offender, M.C.L. 769.12. Petitioner was sentenced to concurrent prison terms of ten to fifteen years for the assault convictions, thirty-two months to fifteen years for the carrying a concealed weapon conviction and the felon in possession of a firearm conviction, and two two-year consecutive terms for the felony firearm convictions. For the reasons stated below, the application is denied and the matter is dismissed.

### II. Factual Background

Petitioner's convictions arise out of two related incidents which occurred on March 28, 1995.[3] First, Petitioner assaulted Henry Wolfe ("Wolfe"). Wolfe was working on his sister Pamela's car when he was approached by Petitioner. Wolfe knew and recognized Petitioner, because Petitioner had lived in the same neighborhood as Wolfe and dated Wolfe's sister Anita.

At about 1:30 p.m., Petitioner approached Wolfe by running at him. Petitioner had a black 9 mm handgun in his hand. Petitioner pointed the gun at Wolfe's upper body and said " '[g]ive me everything you got.' " Transcript Volume I ("Tr.Vol.I") at 51. Petitioner then socked

---

1. Staff Attorney Martin Cadwell provided quality research assistance.

2. Petitioner was also charged with one count of armed robbery, M.C.L. 750.529, and two counts of assault with intent to commit murder, M.C.L. 750.83. The maximum sentence for these crimes is life imprisonment. Petitioner was found not guilty of these charges.

3. The trial transcripts and appellate papers in this case are captioned People v. Todd Jay Miller. Petitioner testified on his own behalf at his trial and is identified as Todd Jay Miller. Petitioner has apparently subsequently taken the name Tajh Miller–Bey.

Wolfe in the jaw twice. According to Wolfe, he gave Petitioner $93 and the keys to Pamela Wolfe's car. Petitioner then went back to his car and left.

Wolfe called the police who arrived at the scene in about ten or fifteen minutes. Later the same day, Petitioner was seen on foot again, this time by Wolfe and two uniformed policemen, Officer Steven Witkowski and his partner Timothy Sutherland. Petitioner ran away when he saw the uniformed policemen. Other officers responded to calls for assistance. The police chased Petitioner. Officer Witkowski saw that Petitioner had a black or blue steel semi-automatic handgun in his hand. Petitioner ran into a house and the police took cover outside. Soon afterwards, the police heard shots being fired and Petitioner was seen in the backyard. Officer Patrick Fortin saw that Petitioner matched the description of the man who had assaulted Henry Wolfe. Officer Fortin pursued Petitioner and confronted him near a sidewalk, yelling "Stop, Police," several times. Tr.Vol. II at 62. Petitioner stopped, turned, and pointed his gun at Fortin. Fortin ordered Petitioner several times to drop his gun. Petitioner did not comply. Petitioner yelled out, "Let me go or I'll shoot you." Tr.Vol. II at 65. Petitioner swung his left hand toward his gun as if to grip it with two hands. Petitioner then fired a shot at Officer Fortin. Fortin returned fire, shooting five times. Officer Weiner also fired at Petitioner. Petitioner was hit by gunfire. When the police approached him, Petitioner tossed his gun aside and submitted to arrest. The gun was seized and admitted as evidence at Petitioner's trial.

Petitioner testified on his own behalf. Petitioner testified that, at the time of the March 28, 1995, events, he was working between 60 and 72 hours a week at the Royal Oak Boring Company, an automobile parts supplier. When asked what the company did, Petitioner replied that it was a boring company. They bored parts for auto companies and the Air Force. Petitioner said that he had a job and did not need to rob anyone. Petitioner further testified that he worked only part of the day on March 28, 1995, and decided to pick up his brother and visit some people in the housing project where they used to live. After arriving there, Petitioner got into a fight with a man named Hars. Henry Wolfe, a friend of Hars, approached Petitioner and Hars, as if to hit Petitioner. Petitioner threw a punch or two at Wolfe, striking him in the face. Petitioner then got in his car and left the housing project.

Petitioner further testified that he subsequently returned to the housing project. Petitioner put his guns in his car, because other people in the project had guns. Petitioner denied robbing Henry Wolfe and denied having been armed when he punched Wolfe. Someone told Petitioner that Henry and Anita Wolfe were riding around with the police looking for him. Petitioner had been shot by a policeman in 1984 and had other negative experiences with police in the housing project. Consequently, Petitioner did not attempt to contact the police to tell them his version of his contact with Henry Wolfe earlier that day.

According to Petitioner, he left a house where he was visiting an acquaintance. However, the residents of the house testified that Petitioner forced his way in while brandishing a gun, ordered them not to call the police, and said he just wanted to run through the house and go out the back door. The residents did agree that they recognized Petitioner, but did not consider his intrusion a visit. The police pursued him. Petitioner admitted he was carrying two guns at this time. Realizing that he might be stopped by the police, Petitioner

headed for a lake where he intended to dispose of the guns. However, before he could reach the lake, the police caught him and shot him. Petitioner could not remember shooting at the police. He acknowledged that it was "possible it could have went off, cause I had the gun in my hand and I'm running." Tr.Vol. III at 59. After he was shot, Petitioner felt like an astronaut floating in space. Petitioner did not remember hearing the police ever telling him to stop. He also denied ever saying anything to the police and denied trying to shoot at and kill the police officers. Petitioner testified that, at the time the police shot him, he did not know that Henry Wolfe had accused him of robbery, although he knew the police were pursuing him.

In addition to the several police officers who contradicted Petitioner's version of the shootout, a twenty-five year old resident of the housing project named Henry Smith and a female resident of the housing project named Jamaica Posey each testified that they saw Petitioner point his gun at the police and fire at them first, before the police returned fire at him.

Petitioner was convicted by a jury of two counts of assault with a dangerous weapon, M.C.L. 750.82, two counts of possession of a firearm during the commission of a felony, M.C.L. 750.227b, and one count of carrying a concealed weapon, M.C.L. 750.227.

### III. Procedural History

Petitioner filed a motion for a new trial presenting the following claims:

I. Petitioner's Due Process Clause and Sixth Amendment rights to an uncoerced jury were violated when the trial court delivered an improper deadlocked jury instruction.

II. By emphasizing testimony that a shot was fired, the trial court violated Petitioner's Due Process and Sixth Amendment rights by emphasizing the prosecution's theory and using the defendant's conduct as an example that would satisfy the elements of the charged offense.

III. If an objection were required to the instructional errors claimed above, trial counsel was ineffective for failing to object.

IV. Because Petitioner did not present the worst combination of offender and offense, the trial court erred in sentencing him to the maximum sentence allowed under State law.

The trial court denied the motion on January 22, 1997.

Petitioner subsequently filed a delayed application for leave to appeal in the Michigan Court of Appeals presenting the same issues. The Michigan Court of Appeals denied Petitioner's application for a delayed appeal "for lack of merit in the grounds presented." *People v. Todd Jay Miller*, Michigan Court of Appeals Docket No. 201074 (June 16, 1997). The Michigan Supreme Court also denied Petitioner's application for leave to appeal. *People v. Todd Jay Miller*, 456 Mich. 957, 577 N.W.2d 688 (1998).

On April 1, 1999, Petitioner filed an application for a writ of habeas corpus presenting the following claims:

I. Petitioner's Due Process Clause and Sixth Amendment rights to an uncoerced jury were violated when the trial court delivered an improper deadlocked jury instruction.

II. By emphasizing testimony that a shot was fired, the trial court violated Petitioner's Due Process and Sixth Amendment rights by emphasizing the prosecution's theory and using the defendant's conduct as an example that would satisfy the elements of the charged offense.

III. If an objection were required to the instructional errors claimed above, trial counsel was ineffective for failing to object.

Respondent has answered the petition's allegations and urges the Court to dismiss the petition, because Petitioner's claims are not cognizable and/or are without merit.

## IV. Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996) ("AEDPA" or "the Act"), govern this case, because petitioner filed his habeas corpus petition after the effective date of the Act. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

As amended, 28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The United States Supreme Court has recently addressed the question of the proper interpretation of the amendments to the habeas corpus statute concerning entitlement to relief. The Supreme Court has stated that "[i]n sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state pris-oner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Supreme Court summarized the standard of review as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 529 U.S. at 412–13, 120 S.Ct. at 1523.

"[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521. "[A]n unreason-

able application of federal law is different from an incorrect application of federal law." *Williams,* 529 U.S. at 410, 120 S.Ct. at 1522.

■ Where constitutional trial error has been shown and the reviewing court concludes that the error had a substantial and injurious effect or influence in determining the jury's verdict, a state court ruling finding such error harmless beyond a reasonable doubt is outside the realm of plausible, credible outcomes and the petitioner is entitled to habeas relief. *Barker v. Yukins,* 199 F.3d 867 (6th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). "[A] state court's application of federal law is unreasonable and a writ may issue only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible, credible outcomes." *Barker,* 199 F.3d at 871. "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

■ A federal court reviewing a habeas petition must apply the presumption of correctness to evidence-supported factual determinations made by a state court. *West v. Seabold,* 73 F.3d 81, 83 (6th Cir. 1996); *cert den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996); *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). This presumption may only be overcome by the presentation of clear and convincing evidence by the petitioner. 28 U.S.C. § 2254(e)(1).

## V. Discussion

### A. Improper deadlocked jury charge claim

Petitioner contends that his rights under the Due Process Clause and the Sixth Amendment were violated by an improper deadlocked jury charge.

In the present case, there is no reasoned state court opinion denying Petitioner's claims. Rather, the Michigan Court of Appeals simply stated that Petitioner's delayed application for leave to appeal was denied for lack of merit in the grounds presented.

■ Where the state court has not articulated its reasoning, federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Aycox v. Lytle,* 196 F.3d 1174, 1177–78 (10th Cir.1999) ("we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented"); *Schaff v. Snyder,* 190 F.3d 513, 523 (7th Cir.1999). That independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris v. Stovall,* 212 F.3d 940, 943–45 (6th Cir.2000).

With these points in mind, the Court shall review Petitioner's challenge to the trial court's supplemental charge to the jury after it announced it was deadlocked.

■ Jury deliberations represent a "critical stage of a criminal trial." *United States v. Ruggiero,* 928 F.2d 1289, 1299 (2d Cir.1991) (quoting *United States v. Ron-*

*der,* 639 F.2d 931, 934 (2d Cir.1981) (citing *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946))). A trial court, upon being informed that the jury is deadlocked, may give the jury an "Allen" charge urging the jury to continue its deliberations in order to arrive at a verdict. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).[4] A supplemental charge to deliberating jurors that urges them to continue to discuss the evidence and to listen "to each other's arguments," but also emphasizes that "the verdict must be the verdict of each individual juror, and not the mere acquiescence in the conclusion of his fellows" has been found proper by the United States Supreme Court. *Id.* at 501, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528.

At the heart of Allen charge jurisprudence lies the basic principle that a defendant has "the right to have the jury speak without being coerced." *United States v. Burgos,* 55 F.3d 933, 936 (4th Cir.1995). Thus, the United States Supreme Court has said that "[a]ny criminal defendant … being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). "The propriety of an Allen-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977) (en banc).

In *Lowenfield,* the Supreme Court reviewed a state prisoner's habeas petition challenging an Allen charge which advised the jurors to consider their fellow jurors' views, while at the same time stressed the

duty of each juror to decide the case for himself or herself. The *Lowenfield* Court upheld the following instruction as uncoercive:

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment. Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Lowenfield,* 484 U.S. at 235, 108 S.Ct. 546, 98 L.Ed.2d 568.

■ If, however, the state court's Allen charge is coercive such that it infringes on a defendant's due process rights to an impartial jury and a fundamentally fair trial, or the interrelated requirements of proof beyond a reasonable doubt and a jury verdict, a writ of habeas corpus should issue. Because habeas corpus review of a state court's Allen charge is limited to constitutional questions, relief will only be granted on the basis of such a supplemental charge where it is " 'established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed by the Four-

---

4. The phrase "Allen charge" refers to supplemental jury instructions that urge deadlocked juries to forego their differences in order to reach a unanimous verdict. The original Allen charge urged the minority of the jury to consider the views of the majority in an effort to determine whether the minority views were reasonable under the circumstances. *Allen,* 164 U.S. at 501, 17 S.Ct. at 157.

teenth Amendment.'" *Clark v. Irvin,* 844 F.Supp. 899, .906 (N.D.N.Y.1994) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368);

■ In determining whether the jury instruction was so coercive as to violate the federal constitution, "the instruction must be viewed as a whole." *Clark,* 844 F.Supp. at 906 (citing *Boyd v. United States,* 271 U.S. 104, 46 S.Ct. 442, 70 L.Ed. 857 (1926)). To warrant habeas relief, a jury instruction must not merely be erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Estelle,* 502 U.S. at 72, 73 n. 4, 112 S.Ct. 475. Thus, as stated by the *Lowenfield* Court, the charge must be considered " 'in its context and under all the circumstances.'" *Lowenfield,* 484 U.S. at 237, 108 S.Ct. 546, 98 L.Ed.2d 568 (quoting *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam) (finding judge's statement to jury, "You have got to reach a decision in this case," coercive)).

Here, the jury began its deliberations on Friday, October 27, 1995, at about 11:00 a.m. Court recessed for the weekend at 5:12 p.m. that day without the jury reaching a verdict. The jury was instructed not to discuss the case over the weekend and to get plenty of rest and return to court on Monday to continue its deliberations.

On Monday, October 30, 1995, at about 10:11 a.m., the jury announced that it was deadlocked and having difficulty with understanding the concept of assault. The trial judge re-instructed the jury on the definition of an assault and advised the jury to review the written instructions on this matter. The jury resumed its deliberations at about 10:30 a.m.

At about 12:00 p.m. the Court reconvened and the jury announced that it was still deadlocked. At this time the jury had been apparently been deliberating for no more than about eight or nine hours total on Friday and Monday in a case involving seven counts, two separate but related incidents, and sixteen witnesses. At this time the trial judge gave the following supplemental Allen charge to the jury:

> You've returned from deliberations indicating that you believe you cannot reach a verdict. I'm going to ask you in a moment to please return to your jury room and resume your deliberations in the hope that after further discussion, you'll be able to reach a verdict.
>
> As you deliberate, please keep in mind the guidelines I gave you earlier. Remember, it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment.
>
> To return a verdict, you must all agree and the verdict must represent the judgment of each of you. As you deliberate, you should carefully and seriously consider the views of you fellow jurors. Talk things over in a spirit of fairness and frankness.
>
> Naturally, there will be differences of opinion. You should each not only express your opinion, but also give the facts and reasons on which you base it. For reasoning the matter out, jurors often reach agreement.
>
> When you continue deliberations, do not hesitate to rethink your own views and change you opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the

weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

You should consider that the case should at some time be decided. You are selected in the same manner and from the same source which any future jury must be and there is no reason to suppose that the case will ever be submitted to 12 men and women more intelligent or impartial or more competent to decide it. Or that more or clearer evidence would be produced on one side or the other.

With this in mind, it is your duty to decide the case if you can conscientiously do so without surrendering you conscientious beliefs.

What I would suggest is that perhaps, take a break, an hour or so, and then come on back and give it another crack at it and then see where we go from there.

Tr.Vol. V at 12–14.

The jury announced that it had reached its verdicts at 2:26 p.m. Petitioner was acquitted of the charges of one count of armed robbery and two counts of assault with intent to commit murder and convicted of the charges of two counts of assault with a dangerous weapon, two counts of possession of a firearm during the commission of a felony, and one count of carrying a concealed weapon.

■ A juror's duty is to impartially consider the evidence and try to reach an agreement without surrendering his or her individual views. *See Allen,* 164 U.S. at 501–02, 17 S.Ct. 154, 41 L.Ed. 528.

■ This Court concludes that the trial court's Allen instruction did not deprive Petitioner of his constitutional rights. First, the trial judge made it clear that each juror should follow his or her own conscience, while carefully listening to the views and opinions of other jurors. Nowhere did the judge say or suggest in any way that any juror should cave in to the will of the majority simply to conclude the case or reach a verdict. On the contrary, the judge stressed that each juror should not give up his or her honestly held beliefs.

Second, the judge's instructions did not single out a minority of jurors. The jury's announcement that it was deadlocked was confined to that simple statement. No indication was made what, if any, polling of the jury had been done, how the jury may have been divided into minorities and majorities concerning any of the seven charges Petitioner was facing. The trial judge did not make any inquiry into the numerical division of the jury, speculate about such matters, or make any reference to minority, majority, or lone or isolated jurors in his Allen charge. Consequently, no juror hearing the Allen instruction could reasonably have thought that the judge was singling out him or her for disapproval or blame. *Williams v. Parke,* 741 F.2d 847, 850 (6th Cir.1984).

Third, the judge's instruction did not state, suggest, or imply that a hung jury was an unacceptable result by emphasizing such factors as the judge's trial schedule, or the time invested in the trial up to that point. *United States v. Scott,* 547 F.2d 334, 337 (6th Cir.1977). The jury had not been deliberating for an inordinately long time, either in total, or on the day the Allen charge was given. Therefore, it cannot reasonably be argued that, under these circumstances, the judge's mere act of encouraging the jury to continue its deliberations implied that a hung jury was unacceptable.

■ The trial judge's Allen charge did remind jurors that the case should at some time in the future be decided and that

there was no reason to believe that a better, more intelligent or more impartial jury would ever be selected, or that more or clearer evidence would ever be presented. In *United States v. Berroa*, 46 F.3d 1195, 1196–98 (D.C.Cir.1995), the court found on direct review that including this language in the Allen was reversible error pursuant to DC Circuit precedent. This Court is not persuaded that inclusion of this language in the trial court's Allen charge entitles Petitioner to relief for several reasons. First, errors complained of in a petition for a writ of habeas corpus must rise to the level of a constitutional violation, while on direct appeal, the error complained of must rise to the level of plain error to warrant reversal. *Boyd v. Scott*, 45 F.3d 876, 878 (5th Cir.1994), *cert. denied*, 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1995). *Berroa* was decided on direct review. There is no indication that the court found that inclusion of the language cited was a constitutional violation. Further, in *Berroa*, in addition to including the language found to be unacceptably coercive, the trial judge failed to remind jurors that no juror should surrender his or her honest conviction as the weight or effect of the evidence solely because of the opinions of other jurors, or merely to reach a verdict. This is a crucial distinction with the present case, where the trial judge stressed that the jurors should not surrender their conscientiously held beliefs.

Finally, this Court concludes that, under the totality of the circumstances of this case, the language referenced in the first sentence of preceding paragraph was not so coercive as to rise to the level of a constitutional violation. The trial judge stressed that no juror should give up his or her conscientiously held beliefs. The trial judge had previously stated that a not guilty verdict could always be appropriate and did not state or imply that a hung jury

was an unacceptable outcome. No inquiry into the numerical division of the jury was made and no remarks were directed at minority, lone, or hold-out jurors. All remarks were directed at the jury as a whole and at all jurors. Finally, the Court notes that while Petitioner was convicted of several serious charges, he was acquitted of the most serious charges against him. This Court concludes that the Michigan Court of Appeals' decision denying Petitioner relief on his Allen charge claim was a reasonable application of controlling federal constitutional law. Therefore, this claim does not entitle Petitioner to habeas relief and is denied.

## B. Claim that jury was misinstructed on the law of assault

Petitioner claims that the trial judge misinstructed the jury on the law of assault. Petitioner asserts that the trial judge improperly cited Petitioner's alleged conduct as an example of conduct satisfying the elements of the crime and improperly emphasized that a shot had been fired by Petitioner.

In *Henderson v. Kibbe*, 431 U.S. at 155, 97 S.Ct. 1730, the United States Supreme Court stated:

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.

*Id.* (citations omitted). *See also, Estelle v. McGuire,* 502 U.S. at 72, 112 S.Ct. 475.

It is the duty of the trial judge to conduct an orderly trial with the goal of "eliciting the truth and . . . attaining justice between the parties." *United States v. Slone,* 833 F.2d 595, 597 (6th Cir.1987). "In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). The judge may not assume the role of a witness. *Id.* at 470, 53 S.Ct. at 699. He or she may, however, analyze and dissect the evidence, as long as the judge does not distort or add to it. *Id.* at 470, 53 S.Ct. at 699. When commenting on the evidence, the trial judge must take great care to avoid undue prejudice of the jury. *United States v. Martin,* 740 F.2d 1352, 1358 (6th Cir.1984).

This Court concludes that the jury charge, in the instant case, was well within the bounds of proper commentary by a trial judge. The judge did not usurp the jury's fact finding role, nor did the judge shift the burden of proof from the government to the defendant. The trial judge's comment that "the testimony in this case was that a shot was fired," Tr.Vol. V at 7, did not add to or distort the evidence, or prejudice the jury.

In the present case, a representative of the jury informed the trial judge that the jury (1) was having difficulty understanding the definition of assault and (2) wanted to know if "going out the door with a weapon in one's hand, without pointing the weapon against anyone, assault by definition?" Tr.Vol. V at 5. The trial judge carefully and correctly instructed the jury on the elements of the crime of assault as follows:

THE COURT: Okay. Are you still having a problem with the concept of what an assault is?

UNIDENTIFIED MALE JUROR: yes.

THE COURT: If one goes to the armed robbery definition, okay, I believe that a better definition of assault is contained therein. Okay.

First, that the Defendant assault Henry Wolfe. There are two ways to commit an assault. Okay? And you can apply this definition to the assault murder too. Either the Defendant must have attempted or threatened to do immediate injury to Henry Wolf or was able to do so or the Defendant must have committed a forceful act that made Henry Wolf reasonably afraid of being injured at the time. Okay? Does that answer the definition of assault?

MS. MATHEWS [Prosecutor]: Yes, Judge.

THE COURT: Mr. Spiekerman?

MR. SPIEKERMAN [Defense counsel]: Your Honor—assault applies here. Armed robbery. I believe there's another definition

THE COURT: I'm going to take a look at the Standard Jury Instructions to see perhaps, at this point, I might want to supplement the instructions with a more specific definition of assault or assault.

MR. SPIEKERMAN: I would appreciate that.

THE COURT: Okay. I will do so, ladies and gentlemen. Let me give you the definition of assault. To prove this charge, the Prosecutor must prove each

of the following elements beyond a reasonable doubt.

First, that the Defendant either attempted to commit a battery on one or the other police officer or did an illegal act that caused the police officer to reasonably fear an immediate battery. A battery is a forceful or violent touching of the person or something closely connected with the person.

Second, that the Defendant intended either to injure the police officer or to make the police officer reasonably fear an immediate battery. An assault cannot happen by accident.

Third, that at the time the Defendant had the ability to commit a battery, appeared to have the ability or thought he had the ability. Would you like me to repeat that definition?

UNIDENTIFIED MALE JUROR: Yes.

THE COURT: Okay. This is the definition of assault which is CJI 2nd 17.1. To prove this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the Defendant either attempted to commit a battery on the police officer in question or did an illegal act that caused the officer to reasonably fear an immediate battery. A battery is a forceful or violent touching of the person or something closely connected with the person.

Second, the Defendant either—intended either to injure the officer or to make the officer reasonably fear an immediate battery. An assault cannot happen by accident.

Third, that at the time the Defendant had the ability to commit a battery, appeared to have the ability or thought he had the ability. That's the definition of assault. Okay? Let's hope that that will help you.

UNIDENTIFIED MALE JUROR: Could we have a copy of that?

MR. SPIEKERMAN: That's what I was going to suggest, your Honor. They could include it in the package.

THE COURT: Yeah, okay. Give me a copy without all this on there.

UNIDENTIFIED MALE JUROR: One more question, your Honor. Does the definition have to encompass all four or can only one be enough to consider it assault?

THE COURT: I'm missing that.

UNIDENTIFIED MALE JUROR: Well, you said each. When you said each, did you mean one of those things could stand by itself to constitute assault or did all four have to be part of it?

THE COURT: Yeah, these are the elements, just like they have yet to show.

UNIDENTIFIED MALE JUROR: All of them?

THE COURT: Yeah, you have to go down the list, each and every element. Dean, please get me the definition of assault right now. Thank you.

MR. SPIEKERMAN: I think once the copies are provided to the jury, that will be clear, your Honor.

MR. MATTHEWS: Judge, the people will so stipulate.

THE COURT: All right. Hold on one second. Let me make sure that I can get a good copy.

I would also remind you that this is a specific intent crime, the assault crimes. And so make sure that you read them in conjunction, you know, with the specific intent and the specific intent for an assault that he either intended to injure or to make the officer reasonably fear an immediate battery. Okay?

That the specific intent that should go along with this, but you have the specific

intent instruction. It's 17.1. Okay. I'm going to have the clerk, along with your other instructions, give you the definition of assault, and as I've explained it to you in the record, then you'll have it in writing and then—want to take these back?

And let's please, resume your deliberations and perhaps we can reach a verdict. Please we can reach a verdict. Please take the jury.

Tr.Vol. V at 8–12.

Reviewing the judge's instructions on assault as a whole, this Court concludes that the trial judge properly instructed the jury on the elements of this crime, including making it clear that to commit an assault, the defendant must have intended to harm or threaten the victim in such a manner that would cause the victim to reasonably fear an immediate battery. The judge explicitly stated that an assault could not happen by accident. These instructions were adequate to guide the jury's deliberations of the assault charges and to answer the jury's question of whether an assault could be committed by merely running out a house while carrying a gun.

The trial judge instructed the jury on the elements of assault in both a general sense and in relation to the alleged acts committed by Petitioner. The trial judge did note that "the testimony in this case was that a shot was fired, according to the People's theory." Tr.Vol. V at 7. The trial judge also carefully instructed the jury that firing a shot would only constitute an assault if the defendant had the specific intent to cause an injury or to the specific intent to make the officer reasonably fear an immediate battery and if the circumstances did not legally excuse or mitigate the act. Further, the trial judge explained that a verdict of guilty of assault with

intent to commit murder required a finding of a specific intent to kill as well.

This Court is not persuaded that the complained of instructions deprived Petitioner of a fair trial. Regarding the judge's reference to the testimony that a shot had been fired, the Court makes the following observations and conclusions. First of all, there was overwhelming evidence which Petitioner did not dispute that Petitioner fired a shot. Several police officers and civilian witnesses testified that Petitioner fired at the officers before they fired at him. Petitioner himself only testified that he did not remember firing a shot. He also indicated that this was possible, as he had a gun in his hand and was running when he was shot. Thus, the crux of the matter was what was Petitioner's intent when he fired his gun, not whether he did so. The trial judge's reference to testimony that Petitioner had fired a shot did not usurp the jury's role as finders of the facts, or improperly favor the prosecution's view of the evidence. Second, the trial judge had instructed the jurors that they were the sole finders of the facts and carefully instructed the jury that the assault crimes were specific intent crimes. The trial judge's comment did not add to or distort the evidence, or usurp the jury's role as sole finder of the facts. Accordingly, this Court concludes that the trial judge's reference to the testimony that Petitioner fired a shot was not constitutional error and did not deprive Petitioner of a fundamentally fair trial.

This Court also finds that the trial judge's reference to the elements of the crime of assault in terms of acts allegedly committed by Petitioner was not improper. First, before doing so, the trial court had already instructed the jury on the elements of the assault crimes in general terms. Moreover, when the trial judge illustrated the definition of the elements of

the assault crimes in terms of acts Petitioner *allegedly* committed against Henry Wolfe and the police officers, this is precisely what he did. The trial judge referred to alleged acts, to acts which he noted that the prosecutor was required to prove, which if proved, would satisfy the elements of the assault crimes in question. The trial judge did not usurp the role of the jury as finders of the facts by discussing the elements of some of the crimes charged in terms of alleged acts Petitioner was accused of committing. The trial judge clearly did not state that Petitioner had committed the elements of a crime, or that Petitioner had committed the acts he was accused of committing which were in dispute. The trial court did not act improperly or unconstitutionally by discussing the elements of the assault crimes in terms that were not abstract or general. *United States v. Blakeney,* 942 F.2d 1001, 1013–14 (6th Cir.1991). Accordingly, this Court concludes that Petitioner's challenges the jury instructions do not merit habeas relief and are denied.

## C. Ineffective assistance of counsel claim

■■ Petitioner contends that it was ineffective assistance of counsel to fail to object to the jury instructions complained of in the habeas petition. This Court disagrees. In order to establish ineffective assistance of counsel, Petitioner must show that counsel's deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Petitioner must show that counsel's performance was deficient and "fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. Petitioner must show that

counsel's performance did "not meet the minimum standards of reasonable professional competence." *Lovett v. Foltz,* 687 F.Supp. 1126, 1137 (E.D.Mich.1988), *aff'd,* 884 F.2d 579 (6th Cir.1989) (unpublished *per curiam* ).[5]

Second, in the *Strickland* Court's "prejudice" prong of its test for constitutionally ineffective assistance of counsel, even professionally unreasonable errors do "not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the judgment." *Id.* at 691, 104 S.Ct. 2052. *See also, United States v. Pierce,* 62 F.3d 818, 833 (6th Cir.1995).

In the present case, the jury instructions of which Petitioner complains were not improper or unconstitutional. The complained of jury instructions protected Petitioner's constitutional right to a fair trial. Consequently, Petitioner cannot show that trial counsel committed an unprofessional error by refraining from objecting to these instructions, or that he was prejudiced, either by counsel's decision not to object to these jury instructions, or by the instructions themselves. Therefore, Petitioner has not shown that he received ineffective assistance of trial counsel. The Michigan Court of Appeals decision finding no merit in this claim is an objectively reasonable application of controlling federal constitutional law. Consequently, this claim does not merit habeas relief and is denied.

## VI. Conclusion

This Court shall deny the petition for a writ of habeas corpus, because the Court is not persuaded that Petitioner's convictions or sentences are based on a decision that is contrary to, or an unreasonable applica-

---

**5.** Holding that failure to object to cross-examination regarding defendant's prior convictions and failure to seek suppression of those convictions fell below the minimal standard of professionally competent performance where it was possible that the convictions could have been suppressed.

tion of, controlling federal constitutional law, or an unreasonable determination of the facts.

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJU-DICE.**