Filed 5/19/15  P. v. King CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACQUELINE SHIN-HONG KING,<br><br>    Defendant and Appellant. | B254930<br><br>(Los Angeles County<br>Super. Ct. No. GA087446) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Jacqueline Shin-Hong King was charged with attempted murder (Pen. Code, §§ 187, subd. (a), 664)[1] and mayhem (§ 203). It was alleged that in the commission of the offenses, she personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)), and in the commission of the attempted murder she personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)). King pled not guilty, denied the special allegations, and pled not guilty by reason of insanity. In the guilt phase, a jury convicted King on both counts and found true the special allegations. In the sanity phase, the jury found that King was sane when she committed the crimes. The trial court sentenced King to prison for a term of life with the possibility of parole for the attempted murder, plus five years for the infliction of great bodily injury and use of a knife, and stayed an additional nine years for mayhem under section 654.

On appeal, King contends the trial court erred in its response to a question posed by the jury shortly after the sanity phase deliberations started. The question concerned whether depression constituted a mental disease or defect. Alternatively, King contends her counsel was ineffective for failing to object to the trial court's response to the jury question. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.** *Guilt Phase*

1. *The Prosecution's Evidence*

King and the victim, Trevor Ozaki, began a dating and sexual relationship in early 2012. King and Ozaki broke up for three to four months after King "flipped out" on Ozaki. King was loud and yelled at Ozaki. She also told him she was using "crystal meth," was bipolar and had issues. The two resumed their relationship after King called

---

[1]     All further statutory references shall be to the Penal Code unless otherwise indicated.

2

and told Ozaki she had a job and was going to school.  After King called, Ozaki picked up King and they went to his apartment and had sex.

About two weeks later, on the evening of September 14, 2012, Ozaki picked up King from her home in Temple City.  King was usually outgoing, but that evening Ozaki noticed she was quieter than usual.  Ozaki brought King back to his apartment in Monterey Park.  King and Ozaki began watching television in the living room.  King suggested they watch television in the bedroom.  Ozaki agreed.  He thought it might lead to sex as it had in the past.  Ozaki and King sat on the bed and began watching a DVD of the film The Bodyguard.  Ozaki put his arm around King and kissed her.  King told Ozaki to turn the lights off and turn the movie off.  She also told him to take his pants off.  Ozaki turned off the television and the lights, took his pants off and returned to bed.  It was pitch black in the room.

After getting back in bed, Ozaki felt three blows to his head near his left ear and on the top of his scalp.  He felt pain.  He ran to the light switch and turned the lights on.  He saw King standing by the bed holding a knife with about a six- to seven-inch blade.  He had not seen the knife before; it was not from his apartment.  King began swinging the knife again and hit Ozaki in the stomach.  King said, "I am going to kill you motherfucker."  Ozaki tried to defend himself by throwing a few punches and then running out of the room.

Ozaki ran to the living room, and King followed him still holding the knife.  Ozaki began throwing things at King, including a vase and part of a weight.  The vase hit King on the arm, but she did not drop the knife.  Ozaki tried but was unable to open the apartment door that had three locks on it.  While Ozaki was trying to open the door, King came after him with the knife.  Ozaki ran to the kitchen, and King chased him.  King swung the knife at him, and Ozaki blocked it with his hand.  Ozaki hit King in the face.  Ozaki put his hands on the knife blade and tried to get the knife from King.  In doing so he hurt his hands.  Ozaki punched King several times and twisted her arm before she dropped the knife to the floor and Ozaki picked it up.

3

Ozaki called 911. When Ozaki went to make the call, King yelled, "Babe, help me, help me." She told Ozaki to "do his worst" and said "I'm sorry" while Ozaki was on the telephone. Before the police arrived, King looked once like she was going to get up and leave, but Ozaki told her to stay there.

When the police arrived, King was sitting on the floor of the living room. Officer Russell Salinas from the Monterey Park Police Department spoke to King. She was quiet and gave short answers. Ozaki was treated by paramedics and taken to the hospital. He received staples to close the cut on his head. He received stitches for a two-inch cut on his cheek and also stitches to his left ear, which was split in half. He had a cut on his right hand from the area of his ring finger to the base of his palm, a half-inch cut on his neck, and four separate cuts on his abdomen, which also required stitches. The nail of his left thumb was cut. He received stitches for a cut on his left kneecap. Ozaki was in the hospital for three days.

### 2. *Defense*

King did not present evidence in her behalf in the guilt phase.

### 3. *Verdict*

On January 13, 2014 the jury convicted King on both counts. The jury also found true special allegations related to use of a deadly weapon, a knife, and infliction of great bodily injury.

## B. *Sanity Phase*

The sanity phase began on January 14, 2014. The parties stipulated that the jury could consider all of the evidence from the guilt phase.

4

1. *The Defense Witnesses*

    a. Shinya King's Testimony

Shinya King (Shinya),[2] King's sister, testified that King's parents were divorced when King was young, and King lived with her father. King moved in with her uncle at age 16 and began hanging around with the "wrong group" of people — people who used drugs and were involved in gangs. King used marijuana, "crystal meth" and Ecstasy. At one point King's family tried to take her to a mental health clinic, but the clinic did not see King. King has a high school diploma and has had about four jobs. The longest lasted two months.

When she was younger King was quiet and spent time in her room "doing her own thing." In the beginning of 2009, a friend introduced Shinya and King to "Raymond." King and Raymond started dating, using drugs and "hanging around hotels." Shinya noticed a change in King. King and Raymond were always arguing, and Shinya saw King crying. King became pregnant by Raymond but did not have the baby.

King and Raymond eventually stopped dating, but King repeatedly called Raymond on the telephone crying. Raymond asked Shinya to tell King to stop calling him and that he did not love her. King did not believe Shinya and said Raymond was kidding and that he loved her. For about a year King continued trying to call Raymond. King went to Raymond's house, but he kicked her out.

After King's breakup with Raymond, King became "psychotic," claiming Raymond was a shot caller and that he had people on the streets following King. Shinya was not sure whether Raymond was a gang member, but he could have been. One time when Shinya and King were in front of their house, King saw a car drive by and said Raymond had put the green light on her; Raymond was getting people to come and kill her. King also told Shinya that Raymond and his people had come to their house, put holes in the ceiling and planted a spy so Raymond would know what King was doing.

---

[2] Shinya King will be referred to by her first name to distinguish her from the defendant. We do not intend any disrespect.

5

After King was incarcerated she asked Shinya to look up Sheriff Leroy Baca for her on Shinya's computer, asking how old Baca was and what he looked like. King said she thought Baca liked her, and that he had put money on her books. King also asked Shinya to look up a scientist named Jonathan Riley. King said she was communicating with Riley through people's heads, and that she was going to live with him in Beverly Hills when she got out. King told Shinya she was going to marry Baca, and later that she was going to marry Riley and have six kids.

Shinya was incarcerated in September 2009 on a fraud charge involving Raymond's friends.

### b. King's Testimony

#### (i) *Background*

Shortly after she was born, King's parents separated. When King was about two, she went to Taiwan to see her mother. King's half-brother molested her every day for "a couple weeks" while she was in Taiwan. King later returned to the United States and lived with both parents. King's parents got divorced when she was four, and she lived with her father. Her father remarried and when King was 14, her father and stepmother kicked her out of the house. She moved in with her uncle. After King was kicked out of her father's house she was depressed. She used the Internet to meet "bad people" with whom she used drugs.

When King was 14 or 15, she met a man named "Downer" online and through friends. About a year after she met him, Downer raped her. King continued to see Downer for a short time after the rape, and she had sex with him twice. King stopped talking to Downer and started using a lot of drugs.

King testified she flunked out of high school when she was a sophomore. She cut herself on the wrist with a razor blade once or twice when she was 14, but it did not leave a scar. She was raped at 17, after which she tried to kill herself by taking pills.

When King was 19 she dated Raymond for a few months. They were both using drugs. He yelled at her all the time; she hit him almost every day and "cheated on him."

6

King became pregnant by Raymond, and her mother made her have an abortion. Raymond told King he did not want to see her anymore. King kept telephoning Raymond and going to his house. King thought Raymond was sending her signs that he loved her, through music, images, and people. Sometimes King would see hearts on the wall and her computer would play songs that were not on her playlist.

In 2010, King went to Alhambra hospital. She was walking outside for hours and was reading banners on the street, thinking they were signs directed to her. She was following lights thinking about whether she should go into the hospital A truck with flashing lights led her to the hospital. King was hallucinating, and high on bad methamphetamine when she went to the hospital.

### (ii) *King's Relationship with Ozaki*

King met Ozaki through an acquaintance. When King dated Ozaki, he once forced her head down on his penis while she was on the drug Ecstasy. After that, Ozaki took King back home. The next day, she "went crazy on him." She called Ozaki by Raymond's name, even though she knew he was not Raymond. She told Ozaki she was always being followed and everybody around her was getting locked up. She liked Ozaki, or "kind of" liked him, but after Ozaki broke up with her for six months to a year, she did not like him anymore.

Three or four weeks before King stabbed Ozaki, King saw a sign in the phone store which said: "Get it done, go on run." King saw signs that she had to kill or harm someone. Some signs told her she had to kill her mother. King also saw signs that told her to harm her friend Reyna.

### (iii) *Events of September 14, 2012*

On September 14, 2012 Ozaki picked King up and took her to his home. King went to Ozaki's house because she had low self-esteem and had nothing to do. Before she left her house, King took a knife from her kitchen and put it in the back of her pants.

7

She took the knife for her protection because Ozaki always forced sex on her.[3] She was not planning on doing anything with the knife unless Ozaki tried to touch her. King knew from Ozaki's friend that Ozaki had guns and had killed three people before and gotten away with it. King never mentioned this to the police.

King testified it was her idea to take the knife; she did not receive any signs that told her to bring it to Ozaki's home. King later testified that when she was in the car she heard someone on the radio say "go to church," and she took that as a sign that she should hurt someone. She also testified that she saw signs in Ozaki's bedroom, including that the TV channels did not work. King did not tell the police, or the staff in the emergency room where she was taken after the stabbing, that she saw any signs.

According to King, it was Ozaki who suggested that they go into his bedroom, but she did not say "no." She knew that Ozaki was going to try to have sex with her. While they were watching a movie, Ozaki "tried to touch" her on the shoulder, and she "let him." Then Ozaki got on top of her with his whole body. She pushed him off and told him to stop. He laughed and said, "you like it."

King told Ozaki to turn off the lights and take his clothes off. She said this to him because she was scared about having sex with him and did not know what to do. King also testified that she told Ozaki to turn the lights off because she "was scared to stab him." Asked whether it made it easier to stab him with the lights off, King replied, "I guess you could say that." King testified she did not receive a sign or hear a voice that suggested she should tell Ozaki to turn out the lights.

King did not tell Ozaki that she did not want to have sex with him. King just wanted to "get it done," which meant harming Ozaki. Ozaki was "just laying there" and she stabbed him in the stomach twice. Ozaki got up and repeatedly punched her. After Ozaki left the room, King went after him with the knife because she thought he was going to get his gun.

---

[3]     King also testified, however, that she only had sex with Ozaki once or twice.

Ozaki came after King and punched her again. King stabbed him wherever she could but could not remember how many times. King tried to run away with the knife, but Ozaki closed the door on her. Ozaki was punching King and got the knife. He pretended he was going to cut King's shoulder with the knife, then he phoned the police. King was hallucinating, thinking about people who were going to come and save her. She screamed, "Help, babe. Help me, help me. How come you're never there when I need you?"

### (iv) *Events After King's Arrest*

King told the police that Ozaki never raped her. She was too embarrassed to tell them he had done so. King did not hear the part of the police interview when asked if Ozaki had raped her. If she had heard that part, she would have said "yes." King acknowledged she usually lies to the police.

While King was in jail on this case, she discovered that this "whole thing was [a] conspiracy" with" big people" who were "playing this game." A sheriff's deputy in the jail showed her some signs. Jonathan, Sheriff Baca, and the scientist confused her by talking to her at once "telepathing" through somebody else's head, including her bunkmate. King testified that the signs and hallucinations did not stop until she hurt someone and went to jail, when the "game" was "over."

By the time of trial, King was taking medication. She felt a lot better and no longer saw signs. Before she went to jail, she did not know that it was wrong to stab someone. King did not tell the prosecution's expert that she knew it was wrong to hurt people. King said she was sorry because she was. She did not realize she would get in trouble until after she stabbed Ozaki. She thought she would get away with it. When the police came, King thought they would be on her side and that the police were playing the game too.

9

c. Dr. Dupee's Testimony

Dr. Suzanne Dupee is a child/adolescent/adult forensic psychiatrist. She was asked to evaluate King to determine whether King was insane at the time of the crime. Dupee opined that King was insane at the time she stabbed Ozaki. Dupee testified that King suffers from a mental disease or defect, schizophrenia, and did not know it was legally or morally wrong to stab Ozaki on the night of the incident. Dupee did not agree with the opinion of the prosecution's expert, Dr. Haig Kojian, that King suffered from depression. She testified: "[King] has constant psychosis. And I don't think that she just has depression. I think she's depressed but in a kind of normal way that she's in jail facing very serious charges, but her predominant symptoms were psychosis." Dupee did not believe King was suffering from drug-induced psychosis in jail or that she has bipolar disorder.

Dupee interviewed King once, on August 21, 2013, about a year after the stabbing. During the initial part of the interview, King's thoughts were logical and linear. About halfway through the interview, King started describing a lot of psychotic symptoms. It was clear she was experiencing a lot of "crazy thoughts." King had paranoid delusions such as her belief that Sheriff Baca and the head of NASA were personally involved with her. King thought she was getting signs and that people were talking about her. She thought an ad regarding toe fungus was put on the television specifically to refer to her. King also exhibited grandiosity, thinking that important people were involved with her and believing signs on buses specifically referred to her.

Dupee believed it was highly possible that King had the psychotic symptoms for a long time. It was Dupee's opinion that King was not malingering or faking her symptoms. Dupee opined that King was psychotic at the time of the incident and did not understand the wrongfulness of her action.

Dupee testified that the 2010 Alhambra hospital records, Ozaki's statement that the incident happened randomly and unexpectedly, the police description of King's blank stare, King's self-incriminating statements to the police, and the report of Dr. Mindy Mechanic, who was retained by defense counsel to conduct a psychological evaluation of

10

King, supported her conclusion. King appeared to have entrenched psychotic symptoms that she described as having had at the time of the incident. King had a delusion when she was in the jail that she was pregnant or at risk of pregnancy that set her off into a psychotic state that was evident to jail personnel and doctors.

2. *The Prosecution's Witness*

Kojian, a clinical psychologist with over 20 years' experience, testified for the prosecution. Kojian concluded that King had been suffering from depression for a very long time, and that depression is a legitimate mental disease recognized in the diagnostic study guide. Kojian concluded nonetheless that King was legally sane at the time of the incident, because there was nothing to indicate she did not know the nature of her actions, or that she did not know what she was doing was morally or legally wrong.

Kojian interviewed King on two occasions, September 18 and September 25, 2013, about a year after the incident. Kojian had King complete a personality assessment inventory. The results indicated King was exaggerating some symptoms. Kojian also questioned King about her personal history. Kojian thought King was a good historian on her life, and he had no problems communicating with her. King told Kojian that she had followed signs to the Alhambra Hospital emergency room in 2010 and told the people there she was confused. Kojian concluded that incident was related to the use of methamphetamine.

Kojian testified that the records from Garfield Medical Center where King was taken after the stabbing did not suggest that King had any mental health problems. The county jail records from five days after King was incarcerated did not suggest any mental health problems. King was evaluated by a psychologist at the jail on September 27, 2012, and the psychologist found no evidence of mental impairment.

Kojian further testified there was nothing to indicate that King did not know the nature of her actions at the time of the incident. Kojian based that on the following: King gave different answers to Kojian, at first saying she was following signs to kill Ozaki, but later saying she went to Ozaki's house because she had nothing better to do.

11

King told Kojian she took the knife to Ozaki's house to harm him, and when he tried to take advantage of her, she "took action." King told Kojian that she stabbed Ozaki because he touched her and she was tired of being touched. King repeatedly told the police she stabbed Ozaki and that it was her fault. King knew she was stabbing Ozaki at the time of the incident.

Kojian also concluded that there was no evidence to suggest King did not know that what she was doing was morally or legally wrong. King ascribed fault to herself; that implies knowledge of culpability. She told Kojian that she wanted to run out of the apartment but was prevented from doing so. King told Kojian she knew it was wrong to stab people, and she stabbed Ozaki because she was angry with him. The probation report also indicated that King said that this was her fault and that she stabbed Ozaki "because he kept importuning her for sex."

Kojian reviewed the jail notes. He concluded that many months after her arrest there might have been some question about whether or not King "came really close to being psychotic." King may have been decompensating due to being held in custody pending serious charges.

### 3. *Jury Instructions, Deliberations and Verdict*

The trial court instructed the jury regarding the insanity defense, using CALCRIM No. 3450. The jury was instructed, in part, as follows: "You have found the defendant guilty of attempted murder and mayhem. Now you must decide whether she was legally insane when she committed the crimes. [¶] The defendant must prove that it is more likely than not that she was legally insane when she committed the crimes.

"The defendant was legally insane if: [¶] 1. When she committed the crimes, she had a mental disease or defect; [¶] AND [¶] 2. Because of that disease or defect, she was incapable of knowing or understanding the nature and quality of her act or was incapable of knowing or understanding that her act was morally or legally wrong.

"None of the following qualify as a mental disease or defect for purposes of an insanity defense: personality disorder, adjustment disorder, seizure disorder, or an

12

abnormality of personality or character made apparent only by a series of criminal or antisocial acts. [¶] . . . [¶] You may consider any evidence that the defendant had a mental disease or defect before the commission of the crimes. If you are satisfied that she had a mental disease or defect before she committed the crimes, you may conclude that she suffered from that same condition when she committed the crimes. You must still decide whether that mental disease or defect constitutes legal insanity."

Shortly after deliberations began, the jury sent a question as follows: "Is depression considered a mental disease or defect, by definition?" The minute order for that date states that "[a]fter notification to counsel, the court by written response, gives further instruction to the jury." The trial court's response was: "It is up to you to determine whether something rises to the level of a mental disease or defect based upon all the evidence."

After about two hours of deliberation, the jury found that King was sane when she committed the crimes.

## DISCUSSION

King contends the trial court's answer ("It is up to you to determine whether something rises to the level of a mental disease or defect based upon all the evidence") was erroneous as a matter of law and violated King's due process rights and right to a jury trial. King argues "[t]he short answer to the jury's question was 'yes'" and that "[a]t a minimum," the trial court should have explained the difference between the common usage of the word "depression" and "its technical use in psychiatry." We find no error in the trial court's response.[4]

---

[4]    The People argue King forfeited her claim of instructional error by failing to object in the trial court. Even though no objection was made, under section 1259 we review the jury instruction to determine whether it affected the substantial rights of King.

13

**A.** *The Trial Court Did Not Misstate the Law or Abuse Its Discretion*

    1. *Standard of Review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  "We consider the instructions as a whole as well as the entire record of trial, including the arguments of counsel.  [Citation.]  If reasonably possible, instructions are interpreted to support the judgment rather than defeat it.  [Citation.]" (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.)

In the absence of a misstatement of law, we apply the "abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury.  [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 802.) "The court is under a general obligation to 'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.'  [Citations.]" (*Dykes*, *supra*, at p. 802; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212-1213.)


    2. *The Response Was a Correct Statement of Law*

Prior to the jury's question, the jury had already been instructed regarding the insanity defense with CALCRIM No. 3450.  King does not contend that CALCRIM No. 3450 was ambiguous or misleading when given.  The jury was required to consider two questions in adjudicating the insanity defense: first, if at the time King committed the crimes she had a mental disease or defect; and second, whether because of that disease or defect she was incapable of knowing or understanding the nature and quality of her act, or that her act was morally or legally wrongful.  Kojian, the People's expert, testified that King suffered from depression and that depression was a mental disease.  Dupee, King's expert, testified that she disagreed with Kojian's opinion that King suffered from depression.  She testified, "[King] has constant psychosis.  And I don't think that she just

14

has depression. I think she's depressed but in a kind of normal way that she's in jail facing very serious charges, but her predominant symptoms were psychosis."

Faced with conflicting evidence whether King had a mental disease or defect connected with depression, the trial court properly instructed the jury that it was for the jury to decide the issue based on all the evidence. As the People argue, the trial court could reasonably have understood the jury's question as asking the court to apply the evidence to the instruction and to determine whether the first element of the insanity defense had been proven. That is not an appropriate role for the trial court. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 315 ["'no matter how conclusive the evidence, a trial court cannot directly inform the jury that an element of the crime charged has been established'"]; *People v. Figueroa* (1986) 41 Cal.3d 714, 741 [trial judge improperly usurped the jury's role by giving an instruction which applied the law to the facts as he understood them].)

King posits a number of theories under which the instruction was error. King argues that "[o]nce there is evidence from a psychologist or psychiatrist that he or she has diagnosed a defendant with a mental disease or defect, which is not otherwise excluded by statute, there is nothing for the jury to decide as to the first element." We disagree. As previously discussed, the experts differed on whether King's depression constituted a mental disease or defect. As with other witnesses, it was up to the jury to determine whether it credited either expert's testimony. (*People v. Vang* (2011) 52 Cal.4th 1038, 1050.)

### 3. *No Additional Instructions Were Mandated*

King relies on the principle articulated in *Bollenbach v. United States* (1946) 326 U.S. 607, 612-613 [66 S.Ct. 402, 90 L.Ed. 350] that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach*, however, is distinguishable. In *Bollenbach*, the trial court answered a jury's question with an instruction that was "simply wrong." (*Id*. at p. 613.) Here the trial court's instruction contained no error of law.

15

King also cites a number of cases holding that a trial court has a duty to define terms which have a technical meaning peculiar to the law. In all of those cases, the trial court failed to define a term used in the jury instructions or to instruct on a general principle of law governing the charges. (See *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51-52 [failure to define "force" where defendant charged with committing lewd or lascivious acts by means of force or duress], disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248; *People v. Hill* (1983) 141 Cal.App.3d 661, 668 [failure to instruct on the legal definition of "extortion" when defendant charged with kidnap for ransom or extortion]; *People v. McElheny* (1982) 137 Cal.App.3d 396, 403-404 [failure to give the standard instruction defining assault].) Here, however, the jury did not ask the trial court to define a term used in the jury instructions, nor did the trial court fail to instruct on a general principle of law governing the insanity defense.

King argues the trial court was under an obligation to explain the difference between depression as commonly understood and depression which constitutes a mental disease or defect for purposes of the insanity defense. King points to no evidence in the record from which the trial court could have articulated the type of response King suggests was required. Kojian testified King's depression constituted a mental disease; Dupee disagreed. Dupee opined King was depressed in a kind of "normal" way, but did not articulate any standard by which she made that conclusion.

### 4. *No Abuse of Discretion*

Here, the CALCRIM instruction was complete, and the trial court's response was a correct statement of law. It was not an abuse of discretion for the trial court to conclude additional instructions were unnecessary. We find unsupported King's arguments that the failure to instruct on the difference between the common usage of the word depression and its psychiatric definition led the jury astray. King claims the jury "could have found [King] sane based on the common usage of the word 'depression' because she had a sad life"; "could have found her sane because she used drugs at one time"; "could have found her sane by their own diagnosis that she had a personality disorder"; and

16

"could have found her sane because she was a bad person who deserved to be punished for the horrific crimes she committed." Not only is the argument speculative,[5] it also requires us to assume the jury ignored the instructions given as a whole, including CALCRIM No. 3450. We decline to do so. A jury is presumed to understand and follow jury instructions. (*People v. Pearson* (2013) 56 Cal.4th 393, 414; *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1348.)

Finally, King contends that the trial court's response, coupled with the prosecutor's closing argument, invited the jury to substitute its diagnosis for that of the experts. The record does not support this conclusion.[6] In his closing argument, the prosecutor focused on the second step of the insanity analysis, rather than the first step. Early in his argument the prosecutor stated: "So did she have a mental disease or defect? Which one? But you know what, for the sake of argument, let's say she does have some mental disease or defect. All right. Let's go with that. But it's not — in and of itself, it's not enough. So what is the 'and'? Because of that disease or defect she was incapable of knowing or understanding the nature and quality of her act, or, she was incapable of knowing or understanding that her act was morally or legally wrong." The balance of the People's argument focused on this latter question.

King takes out of context the prosecutor's remark that, "You know more than these doctors do." This remark was made after the prosecutor noted that the jurors had spent more time listening to King and hearing King being interviewed than the doctors. The prosecutor noted that the jury knows "more about the evidence" than the doctors. We find without merit King's argument that the jury was invited to render their own diagnosis of mental disease or defect.

[5]    See *People v. Bell* (1989) 49 Cal.3d 502 at page 552, rejecting a speculative argument on how an instruction could have affected deliberations.

[6]    To the extent King's argument could be considered a claim of prosecutorial misconduct, this issue was not developed in King's opening brief and will not be considered. (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26; *People v. Battle* (2011) 198 Cal.App.4th 50, 76.)

17

**B.** *Ineffective Assistance of Counsel*

King argues that the failure of her trial counsel to object to the trial court's response to the jury's question constitutes ineffective assistance of counsel and renders the jury's verdict unreliable. To prevail on this claim, King must show that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Farnam* (2002) 28 Cal.4th 107, 201.) If the appellate record does not reveal why counsel "acted or failed to act in the manner challenged, then unless counsel were asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the contention of ineffective assistance on appeal must be rejected. (*Ibid.*; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

King argues that no one could conceive of an explanation why trial counsel would fail to object to the trial court's instruction and "would . . . forfeit her entire claim." We discern no error in the court's instruction, and are not persuaded that failure to object to the court's instruction in any way resulted in a forfeiture of King's insanity claim. Thus trial counsel's failure to object did not fall below an objective standard of reasonableness. (See *People v. Farnham*, *supra*, 28 Cal.4th at p. 186, fn. 36.) We therefore reject the claim of ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

STROBEL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.